1810.

*Lancaster,*
*Saturday,*
June 2.

Carson *against* Blazer and others.

TRESPASS *quare clausum fregit.* The declaration stated that the defendants, " on the 10th day of *April* 1803, " with force and arms &c., broke and entered the close of " the plaintiff in the river *Susquehanna,* in the township of " lower *Paxton* in the county of *Dauphin,* and trod down " his grass to the value of ten dollars there growing, and " broke and entered into the *several fishery* 'of the plaintiff " in the said river, in the township and county aforesaid, " and then and there took 1000 shad of the value of two " hundred dollars, and other wrongs did &c., to the plain- " tiff's damage three hundred dollars." Plea, Not guilty, with leave to justify.

On the trial before the Chief Justice at *Harrisburg* in *April* 1807, the plaintiff deduced a title to himself from the late proprietaries, by warrant of 24th *September* 1736, for 228 acres of land adjoining the *Susquehanna,* and immedi- ately opposite to the fishery in question. The patent under which he held, stated the tract to begin at a birch tree *by the river,* thence by certain courses and distances to a red oak *by the same river,* and thence *by the same* the several courses thereof, to the place of beginning; no part of the land in the bed of the *Susquehanna* being expressly covered by the patent. The brother of the plaintiff, who was the former proprietor of the land, first cleared out a pool for a shad fishery between his own shore and a sand-bank in the river about 200 yards distant, in the year 1773; and afterwards fished there. *Blazer,* one of the defendants, made some further clearing in the pool near the sand-bank in 1796, and he and his sons fished in it from the sand-bank, at first with- out any opposition by the plaintiff; but he afterwards told them to desist, and brought the present action for drawing their seine in the pool, in the spring of 1803. There was but one pool or fishing place between the plaintiff's shore and the sand-bank. A net of the usual length would sweep the whole of it; and one of the witnesses swore that the de- fendants, in drawing their seine, came within fifteen or twenty yards of the plaintiff's shore.

The common law doctrine, that fresh water rivers in which the tide does not ebb and flow, belong to the owners of the banks, has never been ap- plied to the *Sus- quehanna,* and other large ri- vers in *Pennsyl- vania.* Such ri- vers are naviga- ble, although there is no flow and reflow of the tide, and they belong to the commonwealth. No one there- fore has a right to an exclusive fishery therein, on the princi- ples of the com- mon law, nor has such a right been granted to any one by the proprietaries or by the common- wealth. *Quære,* whe- ther a custom that the owners of the banks of the Susquehan- na shall have an exclusive fishe- ry in the river opposite to their shores, is good? Vide *Noy.* 20. *Bro. Abr.* " *Pre- scription.*" pl. 71. The conces- sions or condi- tions of William Penn, 11th July 1681, are con- fined to the first purchasers, and persons claim- ing under them.

Binney.
2b 475
f197 538
197 539

Upon these facts the material question was whether the plaintiff had an exclusive fishery in the *Susquehanna* opposite to his land, and on this point the Chief Justice charged the jury in substance as follows:

TILGHMAN C. J. If the plaintiff has an exclusive right, it must be founded, either 1. on a grant from the late proprietaries, or 2. on prescription, or 3. on the principles of the common law adopted in this country.

1. King *Charles* the second granted to *William Penn* the soil of *Pennsylvania* and the rivers within its limits, together with the fishing of all sorts of fish within the premises, and the fish therein taken. *William Penn* has not granted the plaintiff any right of fishery, nor has he granted him any thing beyond the margin of the river. The proprietary asked no higher price for river lands than others. No doubt he retained the entire right of the river and of every thing in the river, in order that he might make such use of it, as would be most conducive to the public benefit; and he afterwards, at least as far back as the 9th of *May* 1771, gave his assent to an act of assembly, declaring the river *Susquehanna* a highway, and regulating its fisheries in such a manner as to be inconsistent with an exclusive right in any person whatever. The *fourth* and *sixth* articles of *William Penn's* concessions are urged as a grant (*a*). But it appears to me that these concessions are confined to the first purchasers; for there are several things therein agreed to be done by those first purchasers, which cannot be said to be binding on any subsequent purchasers. There are also other grants, as for instance to servants in the *seventh* article, which must

(*a*) Article 4th. That where any number of purchasers more or less, whose number of acres amounts to 5 or 10,000 acres, desire to set together in a lot or township, they shall have their lot or township cast together in such places as have convenient harbours or navigable rivers attending it, if such can be found.

Article 6th. That notwithstanding there be no mention made in the several deeds made to the purchasers, yet the said *William Penn* does accord and declare that all *rivers*, rivulets, woods and underwoods, waters, watercourses, quarries, mines, and minerals, (except mines royal) shall be freely and fully enjoyed, and *wholly*, by the purchasers into whose lot they may fall.

be confined to the original emigrants; and there are stipulations and agreements in a great number of the articles, as in the 3d, 4th, 7th, 8th, 10th, 11th, 12th, 14th, 17th, 18th, and 20th, which must be limited in the same way. Now I give no opinion as to the rights of those first purchasers, and persons claiming under them. The plaintiff is not of that description.

2. No proof whatever has been given of any thing like prescription, either in the plaintiff in particular, or in general in those persons who hold lands adjoining the *Susquehanna.* The first time the plaintiff used this fishery was in 1773, when he cleared away the stones which impeded his seine.

3. The plaintiff relies principally on that rule of the common law, by which rivers, wherein the tide does not ebb and flow, (which are *not navigable*) belong to the owners of the adjoining lands on each side. This common law right, if even it was properly applicable to the *Susquehanna* and *Delaware,* and other large waters, was not deemed proper for this country, nor was it adopted, up to the period of our revolution; because, the several acts of assembly before that time, declaring these rivers to be highways, and regulating the fisheries in them, are incompatible with the common law right; and *since* the revolution, no part of the common law has been adopted except that which was proper for our country. But the common law principle concerning rivers, even if extended to *America,* would not apply to such a river as the *Susquehanna,* which is a mile wide, and runs several hundred miles through a rich country, and which is navigable and is actually navigated by large boats. If such a river had existed in *England,* no such law would ever have been applied to it. Their streams, in which the tide does not ebb and flow, are small.

But there is another objection to the adoption of this principle. The common law gives to each proprietor one half of the river adjoining his shore; and if this doctrine is applied to the *Susquehanna,* every owner of the bank must own all the *islands* nearest to that bank; a right never contended for.

The common law principle is in fact, that the owners of

CARSON
v.
BLAZER.

1810.

the banks have no right to the water of *navigable* rivers. Now the *Susquehanna* is a navigable river, and therefore the owners of its banks have no such right. It is said however that some of the cases assert, that by navigable rivers are meant, rivers in which there is no flow or reflow of the tide. This definition may be very proper in *England*, where there is no river of considerable importance as to navigation, which has not a flow of the tide; but it would be highly unreasonable when applied to our large rivers, such as the *Ohio*, *Allegheny*, *Delaware*, *Schuylkill*, or *Susquehanna* and its branches.

The inconvenience of common fisheries is urged. The only question is whether the plaintiff has an exclusive right; if he has not, he cannot recover. But in point of inconvenience, we are upon the same footing with the navigable waters of *England;* the public may make what regulations they please, by law.

Upon the whole matter, I am of opinion that the owner of land on the banks of the *Susquehanna*, has no exclusive right to fish in the river immediately in front of his lands, but that the right to fisheries in that river is vested in the state, and open to all; of course, that the plaintiff cannot recover.

The jury found a verdict for the defendants; and a new trial, which was asked for upon the ground of misdirection, being refused, the plaintiff appealed to this court.

*C. Smith* and *Duncan* argued for the appellant, and in favour of a new trial. They contended that he was entitled to an exclusive right of fishery in the river opposite to his shore, 1. on the principles of the common law; 2. by the grant of the first proprietary; and 3. by the custom of *Pennsylvania.**

* In the course of their argument, the counsel for the appellant offered to read *ex parte* depositions taken after the trial, to prove a general custom of the country for owners of the banks of the *Susquehanna*, to enjoy an exclusive fishery in the river opposite to their banks. But the court overruled the depositions, upon the ground that new evidence was inadmissible upon an appeal from the Circuit Court.

1. The *Susquehanna* is well known to be a fresh water river, in which there is no flow and reflow of the tide; and which, therefore, although navigated by boats of a certain description, as almost every stream of water may be, does not come within the legal definition of a navigable river. By the common law, fresh water rivers, in which the tide does not ebb and flow, belong to the owners of the adjacent soil. *Harg. Law Tracts* 1. Where the river is an arm of the sea, or where the tide flows and reflows in it, then and then only is it a royal or navigable river, belonging to the king. *Davys's Rep.* 55, (152). In waters of the latter description, an exclusive right of fishery cannot be maintained by the proprietors of the banks; the right is common to all. But in those of the former kind, the proprietors of the land have the exclusive right of fishery on their respective sides, extending generally *ad filum medium aquæ. Carter* v. *Murcot (a), Lord Fitzwalter's case (b).* 1 *Swift's System* 340-3. There can be no doubt that by the common law, the plaintiff is entitled to an exclusive fishery in the river opposite to his bank. Has this part of the common law been rejected by the state of *Pennsylvania?* We contend that it has not. This principle of that law is founded in the wisest policy. Its object is to assign an exclusive proprietor to every thing susceptible of such ownership, and to leave as little as possible in common, to become the source of contention and violence. 2 *Black. Comm.* 261. Its application does not depend either upon the breadth or depth of the stream. It is a substantial rule of property, as much as any part of the common law by which we hold our estates, and embraces all waters which are not navigable within the meaning of that law. The right to the water and the fishery passes as an incident to the ownership of the land. It is the common law effect of a grant of land so situated, to carry with it this right, unless restrained by express words, of which there is nothing in the plaintiff's patent; and so indeed it was decided with respect to a fishery on the *Susquehanna* in the case of *Ewing* v. *Houston (c).*

2. The concessions of *William Penn* are in affirmance of the common law principle. Some of the articles appear to be

(a) 4 *Burr.* 2164.     (b) 1 *Mod.* 105.     (c) 4 *Dall.* 67.

of temporary and limited application; but there is nothing in any of them which confines their operation to the first purchasers. The fourth article in particular embraces all who at any time might become purchasers, conferring a permanent privilege upon them; and the sixth is not so much a grant, as a rule of construction which the proprietary agrees shall be applied to his deeds to whomsoever made; that is, whether the deeds mention it or not, rivers and waters shall be fully and wholly enjoyed by the purchasers into whose lots they fall. It cannot be that the meaning of *William Penn* was merely to give an exclusive right of fishery &c., where the waters fell expressly into the survey of the purchaser, or in other words, where the land covered by water was sold and expressly embraced by the survey; for in such cases the concession was superfluous. It must have been intended to preclude all question as to the purchaser's right, where the land was sold adjacent to the water.

3. The usage of *Pennsylvania* must be so well known to the court as to require no proof. Since the first settlement of the province, fisheries have been uniformly sold and disposed of as exclusive property; and the acts of the legislature which are thought to be incompatible with the right, do affirm it. Until the 9th of *May* 1771, the *Susquehanna* was not a highway even for passing and repassing. By a law of that date, that river and others were declared highways; but to exclude the supposition that the right of fishery was negatived by the law, they are declared to be highways " for the purposes of " navigation up and down the same," and no further. 1 *St. Laws* 557. The practice of fishing in those rivers is expressly recognised; and only so far as is necessary to preserve and improve the navigation is that right affected. The act of 6th *March* 1793, 3 *St. Laws* 310, is still more in our favour. Sand-banks in the river, being purchased solely to interfere with fisheries from the opposite shore, are by that law prohibited from being sold; and the value of such cultivable islands as are left open to purchasers is directed to be ascertained, not only by taking into view soil and situation, but " the advantage that may be derived from the same in regard " to *fisheries;*" a clear recognition than an exclusive right of this kind would go to the purchaser. Islands themselves

would have gone by the common law to the proprietor of the nearest shore; but to guard against this, it was the custom of the proprietaries to issue warrants for the survey of all islands, before they opened the land-office for the public. But the last act upon the subject of fisheries in the *Susquehanna* is of itself decisive of the usage. It defines a pool or fishing place to be that space from the place where nets have been *usually* thrown in the water, to the place where they have been *usually* taken out. It compels persons who live on opposite shores, and have but one pool or fishing place between them which may be swept by one net, to fish alternately once every other day. It prohibits more than one seine from being drawn in a pool once in twenty-four hours; and it punishes all who undertake to fish contrary to the provisions of the act. *Act of* 16*th March* 1807. 8 *St. Laws* 74. It is difficult to imagine stronger evidence, both of the custom, and of the illegality of the common right now set up.

*Hopkins* for the defendants. The whole argument upon the common law turns upon a definition, which however correct in *England*, cannot be defended for a moment in the *United States*. Those rivers alone are navigable, says the common law, in which the tide ebbs and flows; and all rivers that are not navigable, are private rivers, belonging to the proprietors on each side; therefore rivers in which the tide does not ebb and flow are private rivers, and belong accordingly. One thing is very clear by this law, that no man has an exclusive fishery in the waters of a navigable river. Every man may fish in a navigable river of common right. So is the law of nations, and so is the language of reason. *Ward* v. *Cresswell* (a), *Warren* v. *Matthews* (b), *Carter* v. *Murcot* (c). In all cases the substantial question is, navigable or not. The mode of ascertaining the fact may be uniform in *England*, that is, certain appearances may always be taken there as evidence of the fact; but still it is the fact, and not the mode of proof, upon which the rights of parties depend. In *England* a stream is not navigable in law, unless the tide flows and reflows in it; or in other words, so gene-

(a) *Willes* 268.    (b) 6 *Mod.* 73.    (c) 4 *Burr.* 2164.

1810.

CARSON
*v.*
BLAZER.

rally may unfitness for navigation be predicated of all streams in *England* in which there is no tide, that it has at length become a maxim; but it would be absurd, in the highest degree in this country, to take the want of a tide as proof of, or rather the same thing, as unfitness for navigation, when our senses tell us it is not. The only reasonable course is to reject the *English* definition, and to act up to the sense and spirit of the principle which lies in this, that when a stream is altogether unfit for public navigation, it is the subject of private property, but otherwise it is not. That the common law definition and principle cannot both be applied to such a river as the *Susquehanna*, is unanswerably proved by the situation of the islands. A claim to them by the owners of the shore has never been heard of; and yet most clearly, by the common law, the islands in a stream which is not navigable, belong to the proprietors of the banks.

2. The concessions of *William Penn* were personal to the first purchasers. So it was held as to the *ninth* article by Judge *Washington* in the *Springetsbury* ejectments; and so it appears throughout. But granting it to be otherwise, the *sixth* article does not aid the plaintiffs, because the *Susquehanna* does not fall into his lot. It is no more in his lot than the land on the other side of the river. It was retained as proprietary estate, and the commonwealth succeeded to it.

3. Of usage there is no proof. There has not been time for an usage, nor would it be good. A man cannot prescribe for a right as annexed to certain tenements, which is common by law to all the citizens of the commonwealth. It was negatived by the legislature in 1771, before the plaintiff's pool was cleared. It is arguing illogically to say that such an act of legislation is not inconsistent with the fishery, because it merely regulates the passage. The law in fact regulates both fishing and passage; but if the latter alone, it is a denial of the exclusive fishery, because the right depends upon the ownership of the soil and water, which would have precluded the interference of government altogether. All that has been done by subsequent laws may be explained without admitting any thing in favour of the right. The ownership of the shores does certainly give a facility in the

exercise of the common right, which is of much importance. It is sufficient to prevent all the mischiefs which are apprehended from the common right, and was an object that increased the value of those islands which the commonwealth offered for sale. The law for the sale of the islands therefore did well to notice the fisheries, but it says nothing of an exclusive right. So in the last law, pools and fishing places are spoken of as matters of fact, and fishing in them restrained and protected; the object of the legislature was to improve the navigation, to preserve the fish, and to protect the common right; but as to a custom of exclusive fishery, it is no where sanctioned. The forfeitures and penalties negative it. They are not given, as in case of an exclusive right they would have been, to the party injured, but to a common informer.

Whatever may be the plaintiff's right, he cannot recover in this action. He had not that kind of property or of possession which will support trespass. If he ever had possession, he gave it up, and the defendants have held it eleven years.

To the last observation the plaintiff's counsel *replied*, that it was immaterial in this stage whether trespass would lie, because the appeal was founded on the misdirection of the judge to the jury. But it was obvious, if the argument for the plaintiff was sound, that he had both the property and possession; that is, all the possession of which the property was susceptible.

YEATES J. after stating the facts delivered his opinion as follows:

It has been contended on the part of the plaintiff, that the owners of lands on the banks of the *Susquehanna* have the exclusive right of fishery in the river opposite to their shore. 1st. On the principles of the common law of *England*, applicable to our local situation; 2dly, on the original concessions of the first proprietary; and 3dly, by the particular laws and usages of *Pennsylvania*.

Cases have been cited from the *English* books to shew a distinction at common law, between fresh water rivers and

navigable streams, *Hargr. Law Tracts* 1.; that where the tides ebb and flow, rivers are denominated *royal* or *navigable, Davis* 152. (56.): and that in rivers not navigable, the proprietors of the land have the right of fishery on their respective sides, generally extending *ad filum medium aquæ.* 4 *Burr.* 2164. 1 *Mod.* 105. 1 *Swift's Conn. Syst.* 340 *to* 342. It has been urged, that the policy of the law assigns an owner to every species of property within the state; as in lands newly created by the alluvion or dereliction of the waters; so that if an island should arise in the middle of a river, it belongs in common to those who have lands on each side thereof, or to the proprietor of the nearest shore: 2 *Bl. Comm.* 261.

The preamble of the old act of assembly, " for the ad-" vancement of justice, and more certain administration " thereof," passed 31st *May* 1718, recites that " it is a settled " point, that as the common law is the birth right of *English* " subjects, so it ought to be their rule in *British* dominions." 1 *Dall. St. Laws* 133. And the law of the 28th *January* 1777, provides that the common law of *England* shall be in force and binding on the inhabitants of this state. 1 *Dall. St. Laws* 723. But the uniform idea has ever been, that only such parts of the common law as were applicable to our local situation have been received in this government. The principle is self-evident. The adoption of a different rule would, in the language of Sir *Dudley Ryder*, resemble the unskilful physician, who prescribes the same remedy to every species of disease.

The qualities of *fresh* or *salt* water cannot amongst us, determine whether a river shall be deemed navigable or not. Neither can the flux or reflux of the tides ascertain its character. Pursuing such rule would, in the first case, render the river *Delaware* an innavigable stream throughout the confines of the state; and in the second, would confine its navigable quality to its several courses south from *Trenton.* To assert that in either instance the proprietors of lands on the margin of that river, have the sole right of fishery to the middle of its bed, corresponding to their title in front of it, is, I presume, a doctrine which the warmest advocates for the right of exclusive fisheries, would scarcely contend for.

The property of the land covered by the waters of the *Susquehanna* remains in the commonwealth as other ungranted lands. Neither the late proprietaries, nor the state have granted it; and should a new island rise in the river, it would, under the authority of the cases cited, belong to the government. On this branch of the argument, it is sufficient to state that by an act of assembly passed the 9th *March* 1771, assented to by the then lords of the soil, the river *Susquehanna* and certain streams running into it were declared highways; and provisions were made to improve the navigation thereof. 1 *Dall. St. Laws* 556. The cases cited on the argument abundantly shew, that every man may of common right fish with lawful nets in a navigable river; that the proprietors of the land on each side have not the exclusive right of fishery therein, but that the fishery is common and public. 6 *Mod.* 63. 1 *Salk.* 357. *Willes*, 268. 4 *Burr.* 2164.

The original conditions or concessions agreed upon by the first proprietary and the adventurers and purchasers in the province, dated the 11th *July* 1681, have been insisted on by the plaintiff's counsel as a ground of right. The 6th section thereof is in these words:—" Notwithstanding there " be no mention made in the several deeds made to the " purchasers, yet the said *William Penn* doth accord and " declare, that all rivers, rivulets, woods and underwoods, " waters, water-courses, quarries, mines and minerals (ex- " cept mines royal) shall be freely and fully enjoyed, and " wholly by the purchasers into whose lots they fall." 1 *Dall. Append. St. Laws* 7. I do not conceive, that these words would be sufficiently extensive to convey a right to the bed of a navigable river, even to the first purchasers, unless it appeared clearly that it *fell within their lot:* but be this as it may, I fully concur in opinion with the Chief Justice, that these concessions were personal and confined to the first purchasers, and those claiming under them. Amongst the parts of this instrument, consisting of twenty sections, the 3d, 4th, 7th, 8th, 10th, 11th, 12th, 14th, 17th, 18th and 20th sections, will, on examination of the nature of the subjects to which they respectively relate, be found to be applicable to the original adventurers and purchasers. And in the case of the

*Springetsbury* manor in *York* county, in the Circuit Court of the *United States*, it was decided on argument that the 9th section which runs thus,—" In every 100,000 acres the " governor and proprietary by lot reserveth ten to himself, " which shall lie but in one place," was confined to the cases of the first purchasers.

Upon the trial, the act " for regulating the fisheries in the " river *Susquehanna* and its branches," passed 16th *March* 1807, was mentioned, but it had not been then published. Another act of 6th *March* 1793, which bears strongly on the subject in question, was not adverted to. The custom respecting the fisheries in *Susquehanna*, was insisted on as a matter notorious to all who lived near the river, but no evidence was given of it. On neither of these laws, nor on the custom, was the opinion of the Chief Justice required, nor was it given. I think all of them material in the case.

As to the custom, I need no proof of it. I have cautiously avoided looking into the affidavits overruled on the argument. For forty-five years last past at least, I have understood the settled usage to have been, that the owners of lands on the margin of the *Susquehanna*, or the islands therein, upon their clearing out a pool of *reasonable extent* immediately opposite to their respective shores, had and exercised the sole right of drawing their seines therein. Even the defendants in this case gave in evidence, a small additional clearing in 1796 in the pool near the sand-bar, from which, I presume they derived some species of right.

Until lately, I heard of no one pretending to disturb them. The first attempt of that kind, which I now recollect, was the ingenious device practised near *Harrisburg*, of anchoring a raft, at a small distance from the shore, and converting it into a landing place. But the contrivance was rendered abortive by the verdict of a jury. Hitherto I have thought, that the exclusive privilege of fishery, confined and limited as I have stated it, conduced to the public good. It did not injure the navigation of the river. But the wild claim of privilege to the middle of the river, I never till this period heard seriously asserted. There can be no shad fisheries unless the rocks and stones are removed from the bed of the river, which forms the pools. This is frequenly effected at

a considerable expense, and requires renewed attentions. No one will bestow his money and labour on a pool, which afterwards is to become the common right of every citizen. Forcible opposition would of course be made to the invaders of the supposed right; and the shores of the *Susquehanna* would thus be rendered the theatres of violence and tumult. I well recollect, that on the trial of *Diffedorffer et al.* v. *Jones*, before all the judges of this court at nisi prius in this place, we urged on the part of the plaintiffs the established common law doctrine, that the landlord after the end of a term for years, for which lands were leased, was entitled to the exclusive possession, and that it was the folly of the tenant to put in a crop, which he could not remove during the continuance of the lease. But we were told by *M'Kean* Chief Justice, that the tenant was justified by the custom of the country, in what he had done, and that the strict common law rule did not apply to the case. This was previous to the publication of the report of *Wigglesworth* v. *Dallison et al.* amongst us, wherein it was held, that a custom, that tenants should have the way going crop after the expiration of their term, was good. I was then dissatisfied with the decision of this court, considering it as an innovation on settled law. It made a strong impression on my mind, which was increased by the circumstance of Judge *Bryan* copying the *English* case from the book, *Doug.* 190. 201., which arrived some time after, and furnishing me with it at the ensuing court. It is laid down by the court, that the law has a great regard to the usage and practice of the people; the law itself being nothing else but *common usage*, with which it complies, and alters with the exigency of affairs. 2 *Mod.* 238.

At present, the custom I have mentioned, appears to me to be a good one; but I hold myself at liberty to retract this opinion, should further consideration induce me to alter my mind.

The legislature have passed several laws for the preservation of the fish in the *Susquehanna* and its branches. It was discovered, that several persons were desirous of obtaining landings in the river, though even on sand bars, in order to enable them to draw out their nets. It was obvious, that such

1810.

CARSON
*v.*
BLAZER·

1810.

CARSON
v.
BLAZER.

landings would affect the interests of the owners of lands on the opposite shores, if they possessed any peculiar privileges from the situation of their lands. The act of 6th *March* 1793, 3 *Dal. St. Laws* 310., prevented that injury. It directed, that no warrants should issue for islands in the *Susquehanna*, unless the same were susceptible of cultivation; and that all sand bars and islands not susceptible of cultivation, for which titles had not been obtained prior to the 4th of *July* 1776, should be and remain common highways for ever. In ascertaining the value of the islands applied for, regard was to be had to the soil, wood, and distance from the main land, and to the advantages that might be derived from the same, in regard *to fisheries.* I cannot think that these provisions in the law, were founded on the policy of preventing obstructions in the navigation of the river, as has been suggested. The preamble recited, that " it was convenient to dispose of the " islands in the *Susquehanna* and its branches;" and the sale of even sand bars would bring money into the public treasury; but the public sense seemed to be, that this ought not to be effected, to the manifest loss of the individuals on the opposite shores.

The late act, passed on 16th *March* 1807, 8 *St. Laws* 74., shews a legislative exposition of individual rights to fisheries in the *Susquehanna* and its branches. It professed to regulate the fisheries therein, and went into operation immediately after the passing of the act. The third section describes what shall be deemed a pool or fishing place, within the meaning of the law. The fourth section provides, " that whenever there " is, or may be, a pool or fishing place on both sides of the " river, and opposite each other, in whole or in part, or where " there is, or may be, a pool or fishing place on an island, " shoal, or sand bank, opposite, in whole or in part, to the " pool or fishing place on either side of the river or island, " where they sweep the whole channel, no seine or net shall " be drawn in such pools or fishing places, *to both landings*, " in any one period of twenty four hours," and proceeds to direct, that such fisheries shall be alternately occupied, under the penalty of three hundred dollars. These regulations appear to me to be utterly inconsistent and incompatible with the common right of fishing in such pools.

It has been contended by the defendants' counsel, that this action being founded in possession, could not be maintained, unless such possession was shewn in the plaintiff. The possession of a pool of water, and the exercise of the right of fishery in it, is of a very special nature. It is confined to the season when the nets are thrown into the water, and the element is in a constant state of change: and such a possession as the nature of the subject was capable of, should be shewn from time to time. But if the custom I have spoken of be legal, the peaceable possession of the land adjoining the river, would be *prima facie* evidence of possession of the pool. The jury were to judge whether this possession was abandoned and relinquished. I do not find that the Chief Justice charged the jury, or gave his opinion on this point to them.

The light in which this case strikes me, on the best consideration I have been able to give it, is, that it demands reconsideration; and that the peace of the country is intimately connected with our present decision. On another trial, evidence of the usage may be given, without depending on it as a known fact. Its validity may then be determined on, and the laws I have adverted to, will be fully considered and judged of. If the plaintiff cannot establish his exclusive right to this fishery, or shew his possession therein, to the satisfaction of a jury, on a future trial, he cannot prevail: but if his pretensions can be fully established, I see no reason why he should be precluded therefrom; nor can I discover that any injustice will be done thereby to the defendants.

Upon the whole matter, I am of opinion, that a new trial should be awarded, and that the costs of the former trial should abide the event of the suit.

BRACKENRIDGE, J. Whatever may have been the mode of acquiring real estate in *England*, or whatever the nature of the tenure, the designation of separate property in land, would seem to have been by natural boundary, or by the artificial distinction of land marks. The transmission or alienation was made usually by a *descriptio loci*, or by a designation of quantity. If the land was covered with water, a grant of it under that description was necessary to pass the fee simple in the soil; though in order to have an exclusive fishery

1810.

CARSON
v.
BLAZER.

in a river, all that was necessary, was that the party seised of the river, should by his deed grant *separalem piscariam* in it, and make livery *secundum formam chartæ*, in which case neither the soil nor the water passed, but merely the fishery; or should grant *aquam suam*, which was attended by the same consequences. *Co. Litt.* 4. *b.*

The law presumes an incorporeal hereditament like the one in question, to have been originally founded on a grant by him who had the fee simple of the land *aquâ cooperta;* and where a grant by deed cannot be shewn, a prescriptive enjoyment may be alleged as the evidence of a grant. A man may prescribe to have *separalem piscariam* in such a water, and the owner of the soil shall not fish there. *Co. Litt.* 122. *a.*

This is the common law of *England*, which is our law here, so far as regards the nature of the tenure of real estate. The right of piscary must be a right appurtenant to the soil covered with water. It must be a part of the fee simple of that soil, and must be supposed to have been originally granted out of it, by him who had the fee simple. What evidence is there of a grant here? There will not be found any such grant *eo nomine* in the land office, nor in the possession of any person.

But it is alleged that the grant of soil adjoining water, carries with it a grant of such hereditament in the soil covered with water; that is, the grant of one soil, carries with it an hereditament in another; for the right in the water cannot be an appurtenance of the soil adjoining, as it never could have made a part of the fee simple of it. What evidence is there, that the grant of the soil adjoining, carried with it the grant of an hereditament in the soil covered with water? It is not found in any application to the land office, in any warrant of survey, or in the recital or grant of any patent.

Prescriptive enjoyment is alleged as evidence of the grant; an enjoyment whereof the memory of man runneth not to the contrary. Has there been time since the opening of the proprietary land office, or even since the granting the charter to *William Penn*, for such a prescription to run? Admit that there has, so far as regards what may be the subject of a writ of right, in which by the statute of 32 *Hen.* 8. sixty years is the limitation. Yet this prescription is still founded on the

presumption of an original grant. How is this presumption repelled? By the acts of ownership which the proprietary, originally, and the commonwealth since, has continued to exercise on the subject of this alleged grant; or if acts of ownership did not exist, the presumption would be repelled by the history of the settlement of the state. Could it be inferred from the taking *vesturam terræ*, of unappropriated land, that such hereditament had been granted out of it? If this were the case, that the enjoyment for sixty years of the vesture of unappropriated land, would give a right to that vesture *in perpetuum*, the fee simple of most of the lands in the state would have been diminished before they were granted. The same reasoning will hold with regard to a claim of piscary in water.

But the acts of ownership continued to be exercised by the proprietary government, and by the commonwealth since it succeeded to the fee simple of the soil, repel all presumptions of an original grant. The charter to *William Penn* is bounded on the east by the *Delaware* river, and it gives him the free and undisturbed use of rivers within the limits and bounds mentioned, together with the fishing of all sorts of fish. In the conditions or concessions agreed upon in *England*, by *William Penn* and those who were adventurers and purchasers, it is provided that all rivers and waters shall be freely and fully enjoyed by the purchasers *into whose lot they shall fall;* so that it may be inferred, that waters must fall into a lot, before they can be enjoyed. Grants from the proprietary land office have been carried into effect in a manner that excludes all land not contained within the survey returned. For these grants have been originally made, and are still in some measure to be ascertained, not by natural boundary or land mark, or description of place or quantity, as originally in *England*, but by the course of the compass, and measured distance. Where the survey is bounded by the water, and calls for it, as in this case, the land to the water is supposed to pass, even though an interstice may remain *ad filum aquæ;* but no conclusion can be made of a further grant. By the instructions to surveyors, the proprietary would seem to have had in view the accommodating settlers with the use of water, by restricting a front to a certain propor-

tion to the extent back, as a general rule. But I cannot infer from all that I know of these grants, any presumption of an exclusive use of the water, or hereditament of the soil covered with water, but rather the contrary.

The provincial legislature, of which the proprietary by his governor made a part, appear to have exercised from the earliest period, an ownership over all rivers and waters within the province, making them highways, or considering them as such. By an act of 1700, they prohibited the erection of wears, " to the end that all persons inhabiting near any creek " or river in the province, might enjoy all privileges and ad- " vantages that from them were to be reaped." 1 *St. Laws* 21. In 1724 they prohibited the erection of bridges over any river or creek within the province, navigable for any sloop, shallop, flat, or other craft, which might anywise stop or hinder the navigation; reciting in the preamble of the law, that the erection of bridges over rivers, to the obstruction of their navigation, not only affected the interest of the owners of lands upon and near navigable waters above those bridges, but also the trade of the province in general. 1 *St. Laws* 227. In 1761 they again interdicted the erection of wears in the *Delaware*, *Susquehanna*, and *Lehigh*, and made various regulations to preserve the fish in those rivers. 1 *St. Laws* 396. In 1768 they passed an act for regulating the fishery in the river *Brandywine*, with this striking preamble: " Whereas " it hath been represented to this assembly, by petition from " a number of the freeholders in the county of *Chester*, that " live on or near the river called *Brandywine*, that their an- " cestors, themselves, and the poor adjacent inhabitants, have " formerly enjoyed great advantages from the fishery in the " same river; and although no person owning land below the " fork or main branches, *can claim any right, by survey, to the* " *lands covered with the waters thereof*, yet divers persons " have erected dams across the said river, to the almost to- " tal obstruction of the fish running up the same, be it enact- " ed, &c." 1 *St. Laws* 497. In 1771 there is the same preamble, and the same remedy for preserving the fish in the rivers *Codorus* and *Conewaga*. 1 *St. Laws* 547. In 1774 by a law with the same preamble, and with similar regulations, they prohibit all persons *from drawing their seines*

*within twenty perches* of milldams built in a certain manner
on the *Connestogoe.* 1 *St. Laws* 693. In the act of the 20th
of *September* 1783, for settling the jurisdiction of the river
*Delaware*, between the states of *Pennsylvania* and *New Jersey*, there is a provision that each of the legislatures of those
states shall hold and exercise the right of regulating the
fisheries on that river. 2 *St. Laws* 143. By an act of *March*
1803 privilege is given to any persons owning lands adjoining any navigable stream declared a highway, certain rivers
excepted, to erect dams for mills, under the restriction of
not injuring others or *the public.* 5 *St. Laws* 389. The act
of the 8th of *February* 1804, regulating the fisheries in the
*Delaware* and its branches, speaks of a pool, and provides
that where any fishery is occupied upon the *Delaware*, either
the landholder or tenant in possession shall regulate such
fishery, and shall be answerable for all fines and penalties
that may occur on account of any transgression of the act
that may or shall be committed at his or their respective fisheries, and shall give a description in writing of their pool or
fishing place; and if any person shall undertake to fish without having entered security to pay the fines and penalties
that may occur, or without permission of the person who
has entered security, he shall pay one hundred dollars for
every offence. 6 *St. Laws* 77. An act of *March* the 9th 1771,
regulating the fisheries in the *Schuylkill*, prohibits a practice
of fishing with divers seines in the same pool, diminishing
the fish too much, and depriving inhabitants above of a reasonable proportion; and it directs, that where two or more
persons residing opposite to each other near the said river,
on different sides thereof, *may have suitable landing places
on the respective shores*, or on an island opposite thereto, for
taking seines and nets out of a pool or fishing place, it may
be lawful to fish alternately, and not otherwise. 1 *St. Laws*
546. By the act of 13th *March* 1807, we have the latest and
most complete regulations with regard to fisheries, particularly of the *Susquehanna;* from all which I deduce an exercise
of ownership, both under the proprietary, and under the
commonwealth, over all waters not included in surveys, or
which have been made highways; and where the acts speak
of pools or fishing places of persons, the owners of the ad-

1810.

CARSON
*v.*
BLAZER.

joining grounds are meant, who by having the shore, have the right of drawing the seine upon it, but not as having an exclusive right to the pool; so that though other persons could not draw there, the land being owned *ad filum aquæ*, yet an island or sand bar lying off, there could be nothing to hinder the drawing a seine in the same pool, under the regulations prescribed by the act. For by act of the 6th of *March* 1793, all sand bars and islands in the *Susquehanna*, not susceptible of cultivation, and not surveyed and returned into the surveyor general's office for the use of the late proprietaries, are made highways. From hence therefore it would seem to follow, that an individual might fish, as well as the owner of the adjacent soil on either side, under the regulations prescribed; these regulations seeming to respect the reasonable use of a common property, and not the protection of an exclusive enjoyment.

These principles do not apply to surveys which include streams, where the soil covered with water makes a part of the grant. But even in the case of surveys bounded on water, where a small stream intervenes, I can see nothing that can give either of them the exclusive use of that stream. Wading up a brook between surveys on each side, and which call for the brook as a boundary, or pushing a canoe, or throwing out a hook and line, and angling for fish, would not seem a trespass. Could I be disturbed if I occupied a rock in the stream? Might I not claim by my possession against all but the proprietary originally, or the commonwealth now? What is there to hinder me from calling a lizard's length of land my own? *Est aliquid dominum sese fecisse lacertæ.* Admitting however that a streamlet or brook shall not be considered as dividing surveys, so as to make a space separate between them that could be appropriated, shall it be so considered to the mouth of the river which this streamlet shall become? The charter proprietary, the Commonwealth which has succeeded, has not so considered it. This repels the allegation of an undisturbed or acknowledged exclusive occupancy, which must be the foundation of any prescription that can be alleged in this case.

I am therefore of opinion in the words of the Chief Justice at the trial, that the owner of lands on the banks of the

*Susquehanna*, has no exclusive right to fish in the river immediately in front of his lands; but that the right to fisheries in the said river is vested in the state, and open to all.

New trial refused, and
Judgment for defendants.