1812.

COMMON-
WEALTH
*v.*
TAYLOR.

---

## STULTZ *against* DICKEY.

*Chambersburg,*
*Monday,*
*Oct. 5.*

THIS was an action of trespass *quare clausum fregit* against *Dickey*, for breaking and entering the plaintiff's close, and cutting and carrying away sixty-nine acres of rye, and twenty-four acres of wheat there growing, of the value of 659 dollars. It was tried under the general issue before the late Mr. Justice *Smith* at a Circuit Court holden for *Franklin*, in *April* 1808; and it was upon an appeal from his decision that the cause came before this Court.

Upon the trial of the cause, the plaintiff proved, that on the 3d of *October* 1798, he obtained from *Robert Stockton* an assignment of a lease by *Robert Montgomery* of a plantation in *Franklin* county, for the term of five years from *April* 1, 1799. In 1802 *Montgomery* sold the land to the defendant. Prior to the expiration of the lease, and in opposition to a warning by the defendant, the plaintiff sowed wheat and

In an action of trespass for cutting and carrying away his grain, a lessee for years may give evidence that by the custom of the country, he is intitled to the *way going crop*, though it is not specially stated in his declaration, and though he held under a *written lease*, which gave no such right. That custom extends throughout this state, and enters into every contract to which it applies.

A tenant intitled to the way going crop, who enters and warns a third person against cutting it, may maintain trespass *quare clausum fregit* against the wrong doer, notwithstanding he had, previously to the trespass, given up to his landlord possession of the farm, in a part of which the crop was growing.

But a tenant who has underlet a part of his farm to another, and has then surrendered possession as before, cannot recover damages for cutting the crop put in by his under-tenant.

1812.

STULTZ
v.
DICKEY.

rye in part of the land, and in another part rye was sown by one *Miller*, who took an underlease from the plaintiff. After the lease had expired, and *Stultz* had given possession of the premises generally to *Dickey*, he entered at the succeeding harvest, and warned *Dickey* not to cut the grain in question, which had been sown before the lease expired. *Dickey* however did cut and carry away as well the crop put in by the plaintiff, as that by *Miller;* and it was for both injuries that the plaintiff claimed damages in this action.

In the course of the trial, the plaintiff's counsel offered a witness to prove, that by the general custom of the country, a tenant for a term certain, is intitled, after the expiration of his lease, to enter and take away the crop of grain which he had put in the ground the preceding fall. To this the defendant's counsel objected, upon the ground, that if there was such a custom, it should have been stated by the plaintiff in his pleadings, and further that it was not competent evidence in opposition to a written lease. His honour however admitted the evidence, because it was a general custom that the witness was offered to prove. Many witnesses then swore to such a custom. It was also in evidence that the plaintiff had agreed to support *Miller* in the enjoyment of his right to the grain put in by him.

In his charge to the jury, the Judge gave his opinion in favor of the custom, and of the plaintiff's right to recover in this form of action, for the grain put in by himself; but said he would reserve the questions for consideration in bank. In relation to *Miller's* grain, although in strictness *Stultz* could not recover for a trespass to *Miller's* close, yet being consequentially liable to *Miller*, the jury he said might consider that injury in estimating the damages.

The jury found for the plaintiff, 1036 dollars 50 cents damages, and a motion was made in the Circuit Court for a new trial on the following grounds:

1. That evidence of the custom should not have been received under these pleadings, and against a written contract.

2. That the action if founded at all, should have been *case*, and not *trespass*.

3. That no damages could be recovered for *Miller's* grain.

4. That the Judge had expressed himself erroneously, in saying that two of the defendant's witnesses were not to

be believed, it being the exclusive province of the jury to estimate the credit of witnesses.

5. Excessive damages.

The motion was refused; and the defendant appealed to this Court, where the case was argued at the last *September* term by

*Watts* and *J. Riddle* for the appellant, and

*Dunlop* and *Duncan* for the appellee.

*Cur. adv. vult.*

On this day the judges delivered their opinions.

TILGHMAN C. J. after stating the facts, proceeded to say: On the trial, several points of law arose which were decided by Judge *Smith*, before whom the trial was had, but reserved for the opinion of this Court.

1. The defendant's counsel objected to the admission of evidence to prove the custom of *Pennsylvania* by which the tenant was intitled to the " *way going crop*," that is the crop of grain sown by the tenant during the lease and coming to maturity after its expiration.

2. It was contended on the part of the defendant, that the action of trespass *quare clausum fregit*, did not lie, even if the tenant was intitled to the crop.

3. It was also contended on the part of the defendant, that at all events the plaintiff ought not to recover for that part of the crop which grew on the land leased to *John Miller*.

On all these points the Court decided in favor of the plaintiff.

1. When the custom of a country or of a particular place is established, it may enter into the body of a contract without being inserted. Both parties are supposed to know it, and to be bound by it, unless provision to the contrary is made in the contract. It appears to me therefore that it was proper to admit evidence of the custom concerning the " *way going crop.*" I understand that this custom had been recognized by a decision at *Nisi Prius* prior to this action, and that the law had been held as it is laid down in the case of *Wigglesworth* v. *Dallison*, *Douglas* 190. There the custom was limited to a particular part of *England*. With us it is sup-

1812.

STULTZ
v.
DICKEY.

posed to extend throughout the state. In the nature of the thing it is reasonable, that where a lease commences in the spring of one year, and ends in the spring of another, the tenant should have the crop of winter grain sown by him the autumn before the lease expired, otherwise he pays for the land one whole year without having the benefit of a winter crop. If the parties intend otherwise, it is easy to control the custom by an express provision in the lease

2. The distinction is nice between those cases in which trespass *quare clausum fregit* does or does not lie. On a consideration of the cases, I take the law to be, that where one is intitled to the exclusive profits, or crop growing on land, he may support trespass *quare clausum fregit*. Such right is equivalent to a right of possession. It is said in *Co. Litt.* 4, that the grantee of the *vesture* or *herbage* of land, may support trespass *quare clausum fregit*. So where one has the exclusive right of digging ore in a certain place. 1 *Black. Rep.* 482. *Harper* v. *Burbeck*. The same principle was decided in *Wilson* v. *Mackreth*, 3 *Burr*. 1824, the last decision in the *English* courts before our revolution. That was trespass *quare clausum fregit*, brought by one who was intitled to the exclusive right of cutting, digging and carrying away turfs in a certain place. The court were clearly of opinion that the action lay. In the case before us, the tenant had the exclusive right to the crop, while it was growing, and until it was ripe, cut and carried away. If it be objected that he had given up the possession of the plantation on the expiration of the lease, it may be answered, that he still retained the right to the crop, and this right was reduced to actual possession by his entry at the time of harvest. I am of opinion therefore that the action may be supported.

3. As to that part of the land leased by *Stultz* to *John Miller*, the action does not lie, because *Miller* was intitled to the crop, and consequently to the possession. It was a field of about twenty acres, for which *Miller* was to pay a rent of 15*l*. It was urged by the counsel for the plaintiff, that damages ought to be given for this field for a loss *consequential* to the trespass, because *Stultz* would have to answer to *Miller* for the loss of his grain. But consequential damages cannot be recovered, unless there was a trespass; take away the trespass, and the consequential damages are also taken away. Now here there was no trespass, because the plaintiff was

not intitled either to the crop, or the possession of the land on which it grew. I am clearly of opinion that damages ought not to have been given for *Miller's* grain, and so the judge ought to have directed the jury. The judgment must therefore be reversed, and a *venire facias de novo* be awarded.

1812.

STULTZ
*v.*
DICKEY.

YEATES J. The present appeal naturally divides itself into three questions:

1. Is a tenant for a term certain intitled to his way-going crop, without special provision for that purpose in his lease?

2. Can such tenant maintain trespass *quare clausum fregit* against his landlord, who has cut and carried away such crop, after the tenant has surrendered to him the possession of the premises?

3. Ought a new trial to be granted under the circumstances of this case?

1. I take the first question to have been fully put to rest by the decision of the Court at *Lancaster Nisi Prius* in *June* 1782, between *Michael Diffedorffer and others*, plaintiffs, and *John Jones*, defendant. There the agents of forfeited estates had leased to the defendant the lands of *Michael Whitman*, an attainted traitor, for one year from *May* 1778 till *May* 1779, at a certain rent, and the lease was continued for a second year ending the 1st of *May* 1780. The agents, under the order of the Supreme Executive Council, sold the lands to the plaintiffs in *August* 1779, and for the wheat and rye put in during the fall of that year, and reaped in the following year, the *replevin* was brought. Several witnesses, including two of the jurors, were examined as to the custom of the country, that tenants for years who did not receive crops at the commencement of their leases, were intitled to take off the crops which had been sown during the continuance of their leases. The Court were clearly of opinion that the defendant was intitled to the crop, which he had put in during his lease, and the jury found accordingly. Though I was dissatisfied with the opinion then delivered, I have never heard the doctrine questioned since. I have adverted to this case in *Carson* v. *Blazer et al.* reported in 2 *Binn.* 487. Such custom is said in our books not to alter or contradict the agreement in the lease, but only to superadd a right, which is consequential to the taking, although not mentioned therein. There can be no doubt if the tenant was restricted by the

terms of his lease, from removing the grain after his time was expired, that he would be bound by his contract; and I apprehend the privilege of the tenant in general is confined to a reasonable quantity of the lands, in proportion to the residue thereof, according to the course and usage of husbandry in the same parts of the country. The privilege is founded on the highest equity, and conduces to the extension of agriculture.

2. It is admitted that an interest in the soil is not necessary to support an action of trespass. It is sufficient if the party has an interest in the profits. But all the books agree, that a plaintiff, in order to maintain trespass on lands, must have an entire *actual* or at least *constructive* possession in himself. A general property, in the case of real estate, is not as in the case of personal, sufficient to support this action. 1 *Johns.* 512. It appeared fully in the course of the trial, that the plaintiff, previous to the cause of action accruing, had surrendered up the possesion of the demised premises to the defendant, reserving his right to this crop, and had removed to other lands. It has been contended that these lands could not with any propriety be called the *close* of the former, and that he could not support trespass for breaking it; that trespass is founded on the possession only; case lies by the reversioner, and trespass by the tenant in possession, for the same trespass. *Biddlesford* v. *Onslow*, 3 *Lev.* 209. Trespass *quare clausum fregit*, will not lie by grantee of the ear-grass for breaking of his close, but trespass will lie for spoiling of the grass. *Hitchcock* v. *Harvey.* 2 *Leon.* 213. See also 1 *Ld. Ray.* 739.

The case of *Charles Torrance* v. *Joseph Erwin*, determined at *Chambersburg* in *April* 1797, was cited by the defendant's counsel, but the facts were not stated. There the plaintiff being intitled to certain lands in *Peters* township, leased them to *Joseph Grubb* for two years under certain rents, but restricted his lessee from cutting green timber. The lease was continued by successive assignments, and the tenant was in possession when the trespass was committed. The landlord brought trespass for breaking and entering his close, and cutting down and carrying away his trees, and on the trial an objection was made to the form of action. *Smith* Justice and myself decided at *Nisi Prius*, that the suit could

not be maintained, and a verdict passed for the defendant. A new trial was afterwards moved for in bank, on the ground of a supposed error in our opinions, which came on to be argued in *December* Term following; but the Court unanimously rejected the motion.

I frankly admit that my opinion as to the form of action has been changed since the first argument. I had at first conceived, that if the law was considered as a science, and the boundaries of actions adhered to, that the form of action had been misconceived; and that the plaintiff should have brought a simple action of trespass for the taking and carrying away the grain, or trover and conversion, or *replevin*, in either of which modes he would have had a full and complete remedy.

Upon adverting to the circumstances of this case as disclosed in evidence, we find that the plaintiff's lease expired on the 1st of *April*, 1803, and that he paid to the defendant 60*l*. his full year's rent, on the 8th of that month. He quitted the premises and left his way going crop standing in the ground, which he claimed as his right at the time under the settled custom of the country. This he was desirous of reaping, but was prevented by the defendant, who put in his hands and cut and carried away the same, except about ten acres, which, as *John Dickey* the son of the defendant swore, were supposed to have been taken away by the plaintiff in the clouds of the night. Here then the plaintiff had an exclusive right to the possession of the grain, which he had sown in peace, and to enter upon the land whereon it was growing, and cut it down and remove it for his own benefit. He actually entered for that purpose, and was disturbed and prevented from exercising that right, except as to a small part thereof, by the unlawful acts of the defendant. Here also was a possession, which would maintain trespass *quare clausum fregit*. In *Wilson* v. *Mackreth*, 3 *Burr.* 1824, it was adjudged that trespass *quare clausum fregit* would lie for digging and carrying away the plaintiff's turf and peat, although he had no ownership in the land. And in *Clap* v. *Draper*, 4 *Mass. T. R.* 266, it was determined on full argument, that under a grant to one, his heirs and assigns, of all the trees and timber standing in a particular close, for ever, with liberty to cut and carry them away at pleasure, an es-

tate of inheritance passed thereby to the grantee, and that he might support trespass for breaking his close, against the owner of the soil, for cutting down the trees. The reason given by the Chief Justice, applies to the case immediately before us; which is, that he had a separate interest in the soil for a *particular purpose*, although the right of soil was not in him; and when injured in the enjoyment of his particular use of the soil, he might maintain trespass for breaking his close; but not, if his interest had been in common with others. So such action would lie for him as had the herbage, although not a right to the soil; but it would be otherwise if he was intitled to a portion of the herbage for a particular part of the year, in which case he could only maintain trespass for spoiling his grass, and not trespass for breaking and entering his close. The principle upon which these cases were decided, seems fully established at law, and receives confirmation from *Foote* v. *Colvin*, 3 *Johns.* 216, that the owner of lands, and the sower of it on shares, may maintain a joint action of trespass by reason of their joint possession. I feel myself therefore warranted to conclude, in a case of technical form, where the partition line between the forms of different actions is so extremely slight as scarcely to be discerned, that the present suit may be supported.

3. It is obvious, that the same grounds upon which the plaintiff's right of action rests as to receiving compensation for the injury done to him by the defendant, apply also to *John Miller*, who was a sub-tenant under him. Now *Miller* had possession of twenty acres or thereabouts, part of a field of twenty-five acres, which had grain growing on it, and which the defendant cut and carried away. Of these twenty acres, *Stultz* had not the exclusive possession, but had leased them to *Miller* for a certain rent. Exception was taken at the trial, and pressed by the defendant's counsel, that for the grain growing on these twenty acres, no damages could be recovered at the suit of the plaintiff. This was overruled by the Judge, but the point was reserved. Entire damages were given by the jury, which cannot now be separated. The defendant had a right to avail himself of any technical defect in the form of the action; and if he was dissatisfied with the decision of the Circuit Court thereon, he had the benefit of an appeal to this Court under the 4th section of the act of the 20th of *March* 1799. The Circuit Court having been an

emanation from this Court, and subject to its control, we
are bound to do what that Court ought to have done upon
a legal question made before them. I feel myself therefore
constrained, though with regret, to give my voice that the
judgment of the Circuit Court be reversed, and a *venire fa-
cias de novo* be awarded.

BRACKENRIDGE J. By the common law " If tenant for
years, knowing the end of his term, doth sow the land, and
his term endeth before the corn is ripe, in this case, the lessor,
or he in reversion, shall have the corn, because the lessee knew
the certainty of his term, and when it would end."*Litt. sec.* 68.

But the custom of a particular place may vary this law.
" Whether the lease is by parol, or by deed, does not vary
the case." The custom of a particular place must be pleaded
specially. In the case before us it was not the custom of a
particular place that was relied on, but the general custom of
*Pennsylvania*, and needed not to have been pleaded, but
might be given in evidence. A general custom is a general law.

Exception has been taken to the form of the action; that
admitting the custom to give the way going crop, yet for
hindering an entry to take it, or the landlord taking it himself,
the action ought to be case. " If the lessee be disturbed of
his way, he shall have his action upon his case." *Co. Litt.*
56. Where he is *hindered by menaces* to enter, it would seem
to me that it ought to be case. But here it is not hindering
to enter, but the entering himself, the landlord, and taking
the crop. Trespass would seem to be, in strictness, the proper
action, though I do not see but that it might be waved, and case
brought. Why not either trespass or case? " If the lessor
enter upon land leased, and cut down the timber trees, and
carry them away, whereby the lessee will lose the loppings
and shade of them, he may have *an action of trespass or upon
the case*." 1 *Saund.* 323. The boundary of trespass and case is
subtle; and, like a colour in the rainbow, runs into its next.
I see no necessity for applying a glass to distinguish where
the one begins, and where the other ends. If the naked eye
cannot at once see the reason of distinguishing, the giving
notice of the injury alleged, and giving the advantage of any
plea by the defendant that exists in his case, let it pass.
The difference is not worth the microscope. Trespass would
not lie in this case, unless the crop could be considered as

still in the possession of the tenant; and if in his possession, the close which contains it must be considered his. The custom would be imperfect, and would not go the length of serving him, unless keeping this close for him, until he shall have taken away the crop. The landlord by entering, may be considered as having broke the close of the tenant.

The second reason filed for a new trial, is " for misdirection of the Judge in stating to the jury that the testimony of two witnesses uncontradicted by any testimony, and who were proved to be of good character, ought not to be believed." What evidence have we that the Judge did so direct. It is said the reasons filed must have been read to him; or, he must have seen them when filed, and no contradiction appearing, it may be inferred that he did so direct. How should a contradiction appear? And how can it be inferred that the Judge ever saw, or heard of these reasons?

By the Circuit Court law, no appeal from the judgment of the Circuit Court is sustainable, " unless the counsel for the appellant shall have stated in writing his reasons for said appeal." But the appeal is after judgment, and the reasons of such appeal are filed after judgment. The Court who gave the judgment had no control over the reasons, nor right to call for them. Execution goes of course unless reasons are filed. The judge from whom the appeal is made, is not supposed to hear of them, nor in fact ever does. It furnishes no circumstance therefore, from whence to infer an admission by the Judge that any statement made in these reasons is correct. Nor are they taken to be correct on the appeal. It must depend on other evidence, the notes of the Judge himself, the charge filed, or noticed in a bill of exceptions. In the case before us, we have nothing of all these. But, admit that the Judge did express himself in the manner stated, which does not appear from his notes, it is his direction *in the matter of fact* that is alleged, of which we cannot take notice. A doctrine totally novel has been introduced in the argument, *that a judge has no right to contrast the testimony, and to weigh evidence.* I say this is novel; for I had always supposed, that the power in the Court to grant a new trial, *on the ground of being against evidence,* proves, that, in the first instance, a Judge has a right to consider the weight of it. If he can be called upon to set aside what is done, why not discover the inclination of his mind as to

what ought to be done, the conclusion to be drawn from the facts in evidence. On the contrary, the Judge has a right to assist the jury in weighing *the credit of the witnesses*, as well as the effect of written evidence. I have known in a single case, and for the first time a single Judge, (*Yeates*) *Wites* v. *Leightner*, give his opinion in favour of a new trial, on the ground of the Judge who tried the cause having expressed himself too strongly as to the *credit of the principal witness*, on contrasting her testimony with that of others, and with circumstances. I avail myself of this opportunity of protesting against this as a ground whereon to grant a new trial; for what the Judge said to the jury on the trial as to the weight of evidence, is not supposed to come forward, and to be before the Court. It is the *verdict itself* that is to be attacked as being against evidence, and whether the Judge directed strongly or weakly, or *not at all*, on the evidence, is out of the question. It was a matter within his discretion, after summing up the evidence, to communicate his impressions of the weight of it; and I know of no limit to this but his own prudence. There is danger of giving the jury a set against his conclusions if too strongly expressed, even though correct. My memory does not serve me as to any such thing in the books as a ground for a new trial; and on principle it must be seen that it cannot be.

But amongst the reasons filed is this also, "misdirection of the Court for stating to the jury, that although in the opinion of the Court the plaintiff was precluded by law from recovering damages for as much of the grain stated in the declaration to have been taken by the defendant as had been sowed by *J. Miller*, an under lessee of the plaintiff, (between twenty and thirty acres) that it was still a matter for the consideration of the jury in assessing damages." The point of law intended to be reached in this case, is, whether a tenant abusing this privilege by the custom, by putting in an unreasonable portion of the land, with a view to the way going crop, shall have a right of action where he is disturbed in taking it away. On this head, the direction of the Judge appears to me perfectly correct; viz. that it will be a matter for the jury, who may mitigate the damages in consideration of this, or give none at all. A custom ought to be reasonable itself, and reasonably used. The circumstance of underleasing,

1812.

STULTZ
*v.*
DICKEY.

1812.

STULTZ
v.
DICKEY.

would look as if a tenant was grasping at an over crop; but it may have been because he could not himself work what of the ground he might have reasonably put in crop, and this the jury will weigh.

We come then to the last reason alleged for a new trial, that " the damages found by the jury are excessive." I find it impossible to ascertain for myself, whether so or not. It would require an investigation of the matter which I have not an opportunity of making. The whole circumstances were before the jury; the Judge who tried the cause has expressed no dissatisfaction. On the contrary he refused a new trial on any ground, and the appeal is from his judgment, which it it would seem to me, ought to be affirmed.

Judgment reversed.