Barrett, J.
This case was tried upon an agreed state of facts and there are no exceptions. It presents a single question of law, namely, whether under “ An act to estab *242 lish and define the lien of warehousemen,” passed June 13, 1885 (chapter 526), the defendant possessed a general lien upon the property in question
The act reads as follows :
Section 1. A warehouseman or person lawfully engaged exclusively in the business of storing goods, wares and merchandise for hire, shall have a lien for his storage charges, for moneys advanced by him for cartage, labor, weighing and coopering, paid on goods deposited and stored with him, and such lieu shall extend to and include all legal demands for storage, and said above described expenses paid, which he may have against the owner of said goods; and it shall be lawful for him to detain said goods until such lien is paid.
In construing this act the former existing state of the law should be considered. A warehouseman then had a specific lien. Of that there can be no substantial doubt. This lien had been asserted in this State in Schmidt v. Blood (9 Wend. 268), and also in Pennsylvania in Steinman v. Wilkins (7 W. & S. 466). Its existence had been referred to and recognized in Trust v. Pirrson (1 Hilt. 292,297), in Scott v. Jester (13 Ark. 446), and in other cases. Indeed, I find no doubt upon the subject expressed in any case where the specific lien was claimed by a person engaged in the business of warehousing. The lien had been denied in cases where permission was given merely to deposit a chattel in an unoccupied room in a private house (Alt v. Weidenberg, 6 Bosw. 176 ; see also Rivara v. Ghio, 3 E. D. Smith, 264; and In re Kelly, 18 Fed. Rep. 528). Even this was expressly put upon the ground that the bailee was not a warehouseman, and that the chattel was not stored with him in that capacity, “ so as to have a lien by the rules of the common law.” Xor do I think that there was any doubt at the time of the passage of this act, that the warehouseman had a specific lien for the various subjects enumerated in the act. If he had a lien for storage charges and for advances of ■.freight made to a carrier (Page v. Gittuer, 11 Barb. 120), *243 a fortiori he had the same lien for cartage, labor, weighing and coopering.
Indeed, the doubt which formerly arose with respect to the lien of warehousemen had its origin in the supposed limitation of the service to mere house-room, and to the absence of either a public duty to receive the goods or of an expenditure thereon of labor and skill.
The real doubt, however, was as to the existence of a general lien. That also had been established with regard to wharfingers, but doubted as to warehousemen (Rex v. Humphery, 1 McClel. & Y, 173, 194; Naylor v. Mangles, 1 Esp, 109; Spears v. Hartly, 3 Esp. 81; 3 Kent, §§ 635, 641; Story on Bailments, §§ 452, 453 ; 3 Pearsons on Contracts, 268). There seemed to be no just distinction between the warehouseman and the wharfinger, but ever since the doubt expressed by some of the judges in Rex v. Humphery, the point was left undecided. Tet, in that case, Graham, B., said that in his experience he had always “ considered the case of a wharfinger and of a warehouseman as standing on the same grounds.”
Mr. Story also observes (citation supra) :
“ The case of a wharfinger does not indeed seem, in any respect, distinguishable from that of a warehouseman, and it has not in fact been distinguished from it in any solemn adjudication.”
It is not necessary to seek the origin of this doubt or to analyze its justice. It is sufficient for our purpose that it existed, and that the Legislature undoubtedly determined to solve it in favor of the warehouseman. The act in question was not intended to re-establish what was already established, namely, the specific lieu, but to place the warehouseman on the same firm footing with the wharfinger as to the general lien. The latter had acquired the general lien, as Lord Kehyoh observed in Baylor v. Mangles {supra), by repeated proof of usage. In time, evidence of the usage was no longer required, and it became law.
The statute under consideration settles all questions of *244 usage, renders proof thereof unnecessary, reconciles all existing confusion of mercantile thought or judicial dicta : in fine, puts an end to any possible distinction between the two classes. This is the natural reading of the act and it follows its obvious sense. The section is divisible into two-parts. The first gives the lien and clearly specifies the subjects. The second declares that the lien shall extend to and include all legal demands for storage and similar expenses which the warehouseman may have against the owner of said goods. Hot, it will be observed, against the particular goods. That had already been fully provided for in the first division of the section, but against the owner of said goods. This second division would have been quite superfluous if the sole object of the act had been to establish and define a specific lien. The warehouseman had that already by the first division of the section, even if not by the existing law. Plainly, then, the extension of that lien to all legal demands for storage, etc., against the owner, is its extension to all other legal demands besides those particular demands already provided for. This statute is to be fairly construed. It cannot .be said to be in derogation of the common law, for the question was not absolutely settled at common law. But even if it had been, as the act does not take away, change or diminish rights of property, life or liberty, the rule of strict construction should scarcely apply. It would seem also, as thus read, to be a wholesome act, just and reasonable in itself and tending to facilitate mercantile transfers. Delivery orders will more readily be accepted and honored when the warehousemen are not required to settle each charge before parting with the goods upon which, specifically, such charge is a lien.
The fact is, warehousing has become an immense industry in these days, and the act is nothing more than a fair recognition of the advance. Formerly the wharfinger was in the habit of keeping a warehouse on his wharf and the warehousing business was a sort of subsidiary appendage thereto, ow, warehousing, as an independent institution, completely *245 dwarfs the wharfinger; and it would be the height of absurdity to retain the general lien in the one case and deny it in the other.
Upon the whole, we are of opinion that the defendants had a general lien upon the goods replevied, and that, consequently, the learned judge erred in directing a verdict for the plaintiff.
Our judgment, therefore, is for the defendants, with -costs.
Van Bbunt, P. J., and Daniels, J., concurred.
Note on Common Law Liens.
That part of the brief of Charles Stewart Davison, which relates to the Common Law as to liens, contains such a summary of the cases on that branch of the subject that I append it here as a note, with some additions of references to our present statutes.
I. A brief review of the common law on the subject of liens,
II. Liens of various bailees under the common law.
III. The lien of the warehouseman and the wharfinger's lien before the statute.
I. The Oommon-law Lien. [Both of policy and custom.]
The original idea of the lien in the common law was that the, lienor had added to or improved by his work the thing placed in his possession was therefore founded, presumably, upon the theory of his partial ownership therein. This for convenience may be called the “ added value ” theory. The struggle which began to increase and extend the operation of the rule has consistently continued till to.-day with, an almost constant success, though with varying rapidity, and the advance has necessarily been not so much as a general proposition, as by application to individual trades or employments.* It has been helped on from time to time, and at various points by statutes, and again restrained by failure to demonstrate the applicability of the principles involved to the particular class of service.
Incidentally, and with like vicissitudes, but constant steady progress, the contest between the particular and the general lien has proceeded, at times with the assistance of the courts, or their repression where the attempted application of the rule was affirmatively shown not desirable, for special reason applying to the particular class of bailees.

*246

*247 Whittaker, in his treatise on the law of liens, [1st ed., p. 2,] speaking of the kinds of liens whioh are alone involved in the cause here before the court, says: “ . . those which are included under the term in its most limited signification, and in which it has been defined to be 1 the right which one person, in certain cases, possesses of detaining property placed in his possession belonging to another until some demand which the former has, be satisfied,’ per Grose, J., Hammonds v. Barclay, 2 East, 227, 235,” and also cites the expression of Lord Ellenborough, Ch. J., in Wilson v. Balfour, 2 Camp. 579 : “A lien is a right to hold."
After discussing the analogies and dissimilarities between “ lien ” and “set-off,” the learned author continuing, says (page 6), “The courts, taking into consideration the hardship of a person, who has in his possession, as a security, goods on which he has a lien for part of his debt, being obliged to relinquish them, without previously having out of them all the satisfaction they can yield for the whole of his debt, have always inclined to consider such cases as within the clause of mutual credit, wherever the circumstances have afforded an opportunity of considering the transaction as a matter of account ; or of implying, from the manner of dealing between the parties, an agreement, that the goods should be a security for the whole debt; and that the credit was given on that ground, though there was no direct evidence of a positive agreement for that purpose (Exp. Deeze, 1 Atk. 228; Exp. Ockenden, 1 Id. 235). ...” (page 6). “ In cases of lien, the property on which it exists, being considered as a pledge, in ay be detained, though it be of greater value than the debt on account of which it is withholden, until the whole of that debt is discharged . . ’’ (p. S). “ Liens either exist by common law or are created by usage,* ... or by express agreement; and they arc by the law distinguished into two species, namely, particular liens and oeneral liens ; a particular lien is a right to retain the property of another on account of labor employed, or money expended on that same property. A general lien is a right to retain the property of another on account of a general balance due from the owner (Per Heath, J., Houghton v. Matthews, 3 Eos. & Pull. 485, 494).
“The doctrine of liens having taken its rise upon principles of natural equity and commercial necessity, in the earliest period of its existence, we find only the first species, that of particular liens, «bowed without an express contract ; and even that seems to have *248 been admitted only in cases where the justice or necessity of the. case peremptorily demanded its allowance; as where the party was obliged by law to receive the goods in respect to which he claimed the lien, or where he had at his own peril, labor or expense, saved them from loss or destruction at sea, where the owner had abandoned or was no longer able to protect them (Hartfort v. Jones, 1 Ld. Raym. 398).
“ This right, however, which seems to have been first introduced merely on principles of justice and necessity, was afterwards extended to a far greater length, upon those of policy and convenience as well as of justice ; and not only were particular liens admitted in many more instances than those already mentioned, but general liens were allowed to be claimed by implication from the general usage of the trade, or the mode of dealing between the parties, and without any express contract for that purpose. And thus, to the two modes in which liens might before subsist, namely, by common law and express contract, was added a third, by usage, from whence is implied an agreement by which the goods are pledged from the payment of the debt.”
In Stephens’ Blackstone’s Commentaries (6th ed. II., 88), the author . says: “Bailees have also, in certain instances, that right which is technically called a lien, in respect of the goods committed to their charge. A lien is the right of retaining the possession of a chattel from the owner until a certain claim upon it be satisfied; and the rule of the law is that every person to whom a chattel has been delivered for the purpose of bestowing his labor upon it has a lien thereon, and may withhold it from the owner . . . until the price of that labor is paid. Thus . . . the tailor is not bound to deliver up the clothes which he has made, except upon receiving the price which is justly due for the making. Besides this species, which is called a particular lien, there is also a general lien, which is the right of the bailee to detain the chattel until payment be made, not only in respect of that particular article, but of any balance that may be due on a general account between the bailor and himself in the same line of business. These general liens, indeed, being against the ordinary rule of law, depend entirely upon contract, either express, or implied from the usage of the particular trade or business or from the previous course of dealing between the parties. But such usage has been fully established in the case of attorneys, bankers, factors and warehousemen, all of whom (as also some others not here enumerated) have consequently a lien for the .amount of the general balance due to thenVt'rom their customers. ”
So, also, the last writer on this subject [Jones on Liens, 1888,] says, section 1: “The common law liens all relate to personal property'. . and in many instances, modified or enlarged by statute. . . . Final *249 ly, new liens have been created by statute, which had never been asserted in law or in equity, or by maritime law.” Then, referring to the irregular advance of the law in regard to liens above mentioned, he says: “The subject must be divided by reference to the subject matter of the liens. First, by reference to the kinds of property to be affected, and then by reference to the classes of persons in whose favor the liens arise. . . . When we come to the consideration of the lions pertaining to the various trades and callings, such as the liens of attorneys, bankers and others, ... it has seemed best to treat of them in separate chapters, because these liens generally differ from each other by marked peculiarities [error]. And, moreover, as we find no natural order of arrangement, as indicated by the principles governing these lions [error], . . . they are arranged alphabetically.”
He also quotes at length (§ 14), in speaking of particular liens, an extract from a decision by Chief Justice Gibson, of Pa., in 2 Watts & Sa/rgent, 892, McIntyre v. Carver (which is below somewhat more fully referred to, for the reason that it will be necessary to criticize a decision by this learned justice at a later point in the brief), in which the learned judge states, but the context shows that he does not exactly appreciate the limitations of the principle to which he refers, one of the two distinctions in principle, which counsel deem of the greatest importance, between general and particular liens, and the existence of one or both of which two principles will be found to be the underlying reason for all the logical decisions which have been rendered, in which the general lien has been denied to any class of bailees.
Mr. Jones, in the same section (14) specifies the principal particular liens as being those “ of mechanics and artisans, of inn-keepers, of carriers, of sellers or vendors, and of landlords under the process of distress” [but as to landlords, see infra].
Contrast this list with his list of the principal general liens [given in section 17]. “ Those of factors and brokers, of bankers, of attorneys upon their clients’ papers and money, and of warehousemen and wharfingers,”—and it becomes apparent that there is a principle underlying the distinction between the general and the specific lien.
For, in regard to each of the classes of persons mentioned by Mr. Jones in his section 14, as having the particular lien, there arises at once to the mind on their mere mention, the idea of a single transaction between the parties—a particular piece of work done by a mechanic, with no necessary implication that he will be employed again, or that work of exactly the same nature will be immediately again done by him —a temporary sojourn at an inn with no intention of returning,—the delivery of certain goods to a carrier for transportation to a particular place or person, to which (or whom), perhaps, goods may never again *250 be sent—a sale or purchase of a specific lot of goods between parties who may never deal together again—a distraining of a tenant’s goods then on the premises for a specific amount of rent then due.
Regard, on the other hand, the class of cases where the author states the general lien to prevail. The factor at a distant city, representing his principal, who customarily sells goods there through him, and in whose employment an element of continuity and of mutual confidence exists; the banker with whom a merchant’s relations are, for mutual convenience, ordinarily continuous, and where the element of mutual faith and credit comes in; the attorney, in whom the greatest confidence is reposed and who is not changed except for special reason; and the warehousemen and wharfinger whose dock and warehouse from accessibility of location are constantly sought by the same patrons and orders on whom, for entire parcels of goods, or portions of lots, are expected to be honored at sight and without the embarrassing delays which are destructive of business. All of whom also—except (let us hope) the attorney—make advances.
The learned chief justice of Pennsylvania, as above mentioned, says: “ Originally the remedy by retainer seems to have been only coextensive with the workman’s obligation to receive the goods,” and continues, overlooking the other principle arising from the added value theory, and trying to harmonize and reconcile all cases in his mind as proceeding on one and the same principle : “A limitation of it (the lien) which would perhaps be inconsistent with its existence here, for we have no instance of a mechanic being compelled to do jobs for another, but even the more recent British decisions have extended it to the case of every bailee who has, by his labor or skill, conferred value on the thing bailed to him.”
It is clear that this second principle, is the principle on which is founded, as has been well said by Mr. Whittaker (page 16) : “A third rule though still less extensive but more certain . . . where the party is from the nature of his occupation under a legal obligation to receive . . in every such case he is entitled to a lien, for there are certain trades and occupations, the public exercise of which the common law considered indispensably necessary to the general convenience of the community, and has, therefore, obliged all persons who undertake to carry on such trades, to accept, as far as (heir means will admit employment from every individual who offers it with a reasonable reward.”
And here it may be said that the case of common carriers is the great instance in which the general lien has been denied at common law and it is, from cases in regard to that particular calling, as examination will show, that the text writers have extracted practical!)'- every *251 phrase which may be quoted to the court against general liens, and have relied upon them as indicating a policy of the law against such liens.
[Note : This, however, had one exception temporarily. The case known as the case of “ The Dyers of Macclesfield” (Green ». Farmer, 4 Burr. 2214, 2221), where Lord Mansfield decided that the dyers did not have a general lien for the price of dyeing goods which had been already returned. But in which, nevertheless, it is noteworthy that it was inferred from the proven manner of dealing between the parties that the dyers had relied upon the personal credit of the owners of the goods, and also it is to be noted that Lord Mansfield said, “The convenience of commerce and natural justice are on the side of liens, and therefore of late years courts lean that way.”]
The leading common carrier case is that of Rushforth v. Hadfield, 6 East, 519, also after re-trial, 7 East, 224, where it was, in brief, decided that the claim of a carrier to a lien for his general balance was contrary to the policy of the common law and the interest of trade, he being compellable to receive and carry for any one, and it being, therefore, held that he must accept goods under the general conditions of the law, and the owner is, therefore, held to have, in each instance, presumably contracted under the general law, and, therefore, no custom for the carrier to have a general lien can be predicated on any usage! There being no presumable first instance, there can be no succeeding instances, and no custom or usage can arise. Through the law casting a burden on the common carrier to accept the goods of all men, provided he has sufficient convenience for such carriage, and a reasonable reward is tended him at the time, it follows that he cannot make stipulations in this regard.
[Though it is to be noted that Mr. Lawson, in his work on usages and customs (§ 100), citing Holderness *. Collinson, 7 Barn. & Gres. 212, and Eutchinson on Carriers, § 477, seems to think that, by usage even a carrier can obtain a general lien in a particular locality, or as against persons in particular businesses, and the cases support this view.]
This principle applies to the case of inn-keepers also, as well as farriers and other classes. As does also by assimilation the principle first referred to, which latter also applies to those cases (the mechanic and others) which are not touched by the “ public necessity ” theory.
Mr. Jones, in his work on liens (§ 263), states, in regard to the origin of the carrier’s lien, that it is founded on the common law principle that a bailee of goods who alters or improves their condition is entitled to a lien on them for his compensation. To be accurate, he should, in enunciating the principle applied in the case of a carrier, *252 specify that it is founded on an assimilation to that principle, since the carrier, like the factor, the broker, the warehouseman and wharfinger, and others, does not actually alter or improve the condition of the goods; -but the context shows that the author’s reason for choosing this as the principle, is because he can make it apply to the carrier by sea, he believing that under the common law the carrier by water was not bound to carry for any person whomsoever, and yet finding the fact to be that the carrier by water has a lien. But this is error. The common carrier by water, under the common law, was equally bound to carry. As Whittaker says (p. 95) : “ Owners of general ships (Abb. ■112-215) and vessels carrying goods for hire on the high seas, or on navigable rivers (as hoymen and lightermenj, are common carriers by the custom of the realm, and being under the same obligation, and subject to the same responsibility by the common law as carriers by land (Coggs v. Bernard, 2 Ld. Raym. 918), are entitled by that law to the same particular lien.”
It would, therefore, seem that, to be accurate, Mr. Jones should have limited his paragraph on the origin of the lien to his first statement, and should have ascribed the fact of the carrier by water having only the particular lien to the fact that he was under the same obligation as the carrier by land, instead refusing to assign the existence of the lien in the case of land carriers to the fact that they are compelled to carry for any persons whomsoever—on account of his false assumption that carriers by water are not so bound.
II. Liens of Various Bailees under the Common Law.
To take up, then, the various classes of bailees or persons assimilated to bailees, and consider the respective liens which they had under the common law.
We find that attorneys and solicitors had a lien for their costs upon all papers of their clients that came into their possession in those characters for the purpose of business, and that such lien was a general one, and applied, though such papers did not come into their hands in the particular cause or on the particular occasion from which their demand arose. According to Lord Mansfield, the custom was not of very ancient date, but was established on general principles of justice. Wilkins v. Carmichael, 1 Doug. 104. They had likewise a lien upon the recovery if it come into their hands; they could have an order stopping payment of the money to the client until their bills were paid; might recover the amounts of their liens and costs against a defendant’s attorney who paid over to the plaintiff after notice from the plaintiff’s attorney not to do so ; had a lien on money in the sheriffs hands levied under execution in their client’s favor; also on *253 awards by arbitrators. Mitchell Oldfield, 4 T. R. 123 ; Welsh v. Hole, 1 Doug. 238; Taylor v. Popham, 15 Vesey Jr. 72 ; Read v. Dupper, 6 T. R. 361; Griffin v. Eyles, 1 H. Bl. 122; Ormerod v. Tate, 1 East, 464.
Also that hankers had a general lien upon all paper securities of their employers in their possession, it being not only for debts accruing on the principal’s account for which the securities were deposited, but also for balances due to them on their accounts from the same employer. Jourdaine v. Lefevre, 1 Esp. 66 ; Davis v. Bowsher, 5 T. R. 488.
The bankers’ general lien, like all other general liens, is part of the law merchant, and the courts are bound to take judicial notice of it. In Brandao v. Barnett, 12 Cl. & Finn, 787 (approved in L. R. 1 App. Cas. 487), Lord Lyndhuust said: “ There is no question that by the law merchant a banker has a lien . . for his general balance. I consider this as part of the established law of the country. The courts will take notice of it. It is not necessary to plead it, nor is it necessary that it shall be given in evidence in the particular instance.” And Lord Campbell, in, the same case, said : “ The usage of trade by which bankers are entitled to a general lien is not found in the special verdict, and unless we are to take judicial notice of it, the plaintiff is at once entitled to judgment, but, my lords, I am of the opinion that the general lien of bankers is part of the law merchant, and is to be judicially noticed. . . When a general usage has been judicially ascertained and established, it becomes part of the law merchant, which courts of justice are bound to know and recognize . . and justice could not be demanded if evidence were to be given toties quoties to support such usages, an issue being joined upon them in each particular case.”
That a calico printer had not only a particular lein upon linen placed in his hands for the execution of the purposes of his trade for work done to that linen, but also for the general balance due for printing other linen for the same employer. Exp. Andrews, Co. B. L. 429 ; Weldon v. Gould, 3 Esp. 268.
The case of dyers is most instructive as showing how the settled law becomes established, and may well be referred to here. It appears that the dyers of Macclesfield were held not to have a general lien (Green ®. Farmer, supra). That the dyers of had a general lien by custom (Savil v. Barchard, 1801, 4 Esp. N. P. 53). That the dyers of Gloucester had a general lien (Humphrey v. Partridge, 1803, cited in Montague on Liens, p. 38, n.). That the dyers of Halifax had not a general lien (Ridell v. Waterhouse, 6 East. 523). That the dyers, dressers, whitsters, printers (cloth) and calen *254 derers of Manchester had a general lien. Kirkman v. Shaweross, 6 T. R. 14; Clark v. Gray, 4 Esp. 178,
In other words, in the course of establishing a general custom in the dyeing trade, some cases failed for lack of proof. But it cannot, it would seem, be doubted, where a principle of law depends on the proof of custom, that when a court, in overruling an authority [as Mr. Justice Lawrence overruled Green n. Farmer, supra, in Humphrey v. Partridge, supra], observes that the custom negatived by the cited case has been established in several separate cases, that from that time on the custom stands without further proof.
For, as Mr. Lawson says in his work on Usages and Customs (§ 56), citing Hammond v. Wharfield, 2 Har. & J. 151: “ Reported cases where commercial usages are held to be established by testimony are relevant in subsequent cases between other parties involving similar usage at the same time and place, or at a time riot far removed.” And, as he further says (§ 64), “ A general usage may be judicially noticed by the court for the first time on appeal,” citing Coyle v. Gozzler, 2 Cranch C. C. 625; Goldsmith v. Sawyer, 46 Cal. 209; Templeman v. Biddle, 1 Harr.(Del.) 522; Stultz v. Dickey, 5 Binn. 285; Carson v. Blazer, 2 Id. 475 [and see authorities mentioned under heading “Banker,” supra,].
And it may be well to note here, if any point is raised in regard to the silence of the warehouse receipts, that the same writer (§ 188), speaking of usages, says: “At first admissible only to explain the meaning of technical terms in written contracts, the office of a usage soon became more extended. It was not long before it was recognized by the courts that it was as necessary to allow usage to explain what was purposely not said, as what was carelessly ill expressed. Experience taught that, in the hurry and bustle of trade, and in all the transactions of busy men, only a portion of the real bargain was actually written out. In all contracts as to the subject matter of which usages prevail, parties are found to proceed with the tacit assumption of these usages. They commonly reduce into writing the special particulars of their agreement, but omit to specify those known usages which are included, however, as of course by mutual understanding.” Citing Coleridge, J., in Brown v. Byrne, 3 El & Bl. 703."
Factors, also, since the case of Kruger v. Wilcox, Ambl. 252, a. d. 1755, if not before that time (Ld. Mansfield, 4 Burr. 2218, intimates a doubt), had a general lien, upon the same principle that general liens had been admitted in other cases, by general usage of the trade, and whenever there was a course of dealings and a general account between a principal and factor, and a balance was due to the factor, he had a *255 lien upon all goods of the principal in his hands in the character of factor for such bills, without regard to the time when or to the account upon which he received them. Gardner v. Coleman, cited 1 Burr. 454; Exp. Emery, 2 Vesey, 674, and many other cases. Of course, the factor, as everyone else, could waive his lien by special agreement. Walker v. Birch, 6 T. R. 258; Cowell v. Simpson, 16 Vesey Jr. 280.
[Judicial notice is taken of the factor’s right to a general lien. Barnett v. Brandao, supra, per Ld. Denman, Ch. J.]
[Present statute as to factor’s lien, L. 1830, c. 179 ; same stat. 4 R. S. 8 ed. 2517, and see cases in Abb. N. Y. Dig. tit. Factor.]
Fullers had a general lien (Sweet v. Pym, 1 East, 4) for balance due in the course of trade, from the owner of cloth delivered to them to be fulled.
The insurance broker had a general lien for balances due from his employer. Whitehead v. Vaughn, Co. B. L. 566; Parker v. Carter, Co. B. L. 567.
A packer had a general lien on goods in his hands, not only for the price of packing them, but by assimilation of his trade to that of the factor, had also, by the usage of trade, a general lien on them for a general balance due to him from his employer. Exp. Deeze, 1 Atk. 228; Green v. Farmer, 1 W. Bla. 651; s. c., 4 Burr. 2214. The assimilation of his trade to that of a factor is found in the fact that he customarily advanced money to his employers on the cloths in his hands to be packed.
On the other hand, as to particular liens:
Artisans [or mechanics], who by skill and labor, had enhanced the value of a chattel, had a particular lien on it for reasonable charges, provided the work was done with the consent of the owner. Cowper v. Andrews, Hobart, 39.
[Mechanic’s liens, under the existing statutes, generally relate to real property exclusively. The existing statutes will be found collected in 4 R. S. (8th ed.) 2693. Railroad laborers may, by L. 1875, c. 392 (4 R. S. 8th ed. 2704) have a lien on rolling stock, as well as on the road. etc.
For labors on oil wells, etc., the lien extends to the tank, etc., and the well, although by L. 1883, c. 372, oil wells and fixtures on leased lands are deemed personal property.
Lien on shipping, see Abb. N. Y. Dig. tit. Shipping],
Agistors [including livery stable keepers], had no lien. Of them it was said that it could not be predicated that they actually improved the thing entrusted to their care. They fed the horse or grazed the cattle for the purpose of keeping it alive, and returned it to its owner *256 presumably in the same condition in which they received it. Jackson v. Cummings, 5 M. & W. 342; Chapman v. Allen, Cro. Car. 271. That this was the underlying reason seems all the clearer when we consider the well known stallion case, Scarfe v. Morgan, 4 M. & W. 270, allowing a lien, and the fact that horse trainers had a common law lien. Bevan v. Waters, 3 C. & P. 520; Forth v. Simpson, 13 Q. B. 680, founded, of course, upon the increased value imparted to the animal , through the expenditure of skill and care thereon. Of course, in the two latter cases, the lien was a particular one against the particular 1 animal for its keep and care and the agreed price or value of the sert vices rendered. But that the reasoning in the case of agistors, whereby i'a lien was denied them, was not wholly sound seems probable, and jthey may be said to have suffered from a certain crudity of reasoning on the part of the earlier judges (see the opinion of, and cases cited by, Brewer, J., in Kelsey v. Layne, 28 Kansas, 218).
[For present statute, see L. 1872, c. 498; same stat. 2 R. S. 8th ed. 1422 ; and see Lessels v. Farnsworth, 3 How. Pr. N. S. 73; Id. 364; s. c.,13 Daly, 473; Armitage v. Mace, 48 Super. Ct. (J. & S.) 107; affi’d 96 N. Y. 538; Eckhard v. Donohue, 9 Daly, 214; Jackson v. Kasseall, 30 Hun, 231].
[Boarding-house keepers. For present statute see L. 1860, c. 446, amended by L. 1876, c. 319; same stat. 2 R. S. 8th ed. 1420; Misch v. O’Hara, 9 Daly, 361, and cases there cited. McIlvane v. Hilton, 7 Hun, 594; Smith v. Keyes, 2 Supm. Ct. (T. & C.) 650; Birney v. Wheaton, 8 N. Y. State Rep. 347.
Concurrent remedy to enforce the lien. L. 1879, c. 530; same stat. 2 R. S. 8th ed. 1420.
Emigrant boarding-house liens restricted. L. 1848, c. 219; same stat. 3 R. S. 8th ed. 2313.
Surreptitious removal of baggage without paying, punished by L. 1886, c. 645, amending Penal Code, § 382.]
The clerks of the several courts were held to have liens upon papers placed in their hands by attorneys or solicitors until their fees in connection therewith were paid. Farewell v. Cocker, 2 P. Williams, 460; Taylor v. Lewis, 2 Vesey, 111.
A commissioner of deeds was held to have a particular lien on the deed for the price of the acknowledgment. Exp. Grove, citing Hollis v. Claridge, 4 Taunton, 807 ; Blackbourn v. Brown, 1 Bingh. 277.
The common carrier has been considered in full before, but it may be noted here in relation to the common carrier by water, in furtherance of the argument above, that it was held (see Gisbourn v. Hurst, 1 Salk, 249, and Bac. Abb. tit. Carriers) that “ every person who undertakes generally to carrj" the goods of all persons indifferently for *257 hire, as masters and owners of ships, lightermen, hoymen and proprietors of wagons, come under the denomination of common carriers.”
[Present carriers lien on baggage, L. 1837, c. 300; same stat. 4 R. S. 8 ed..2519.
— on express freight, L. 1855, c. 523; same stat. 4 R. S. 8 ed. 2520.]
Farriers, who are “from the nature of their employment (which is one of those the exercise of which the law considers necessary) to shoe the horses of any who requires him so to do, if he has sufficient materials for the purpose, and an adequate reward is offered to him” (21 H. 655-56 ; Keilway, 50 ; Lane v. Cotton, 1 Ld. Raym. 654; s. c., 1 Salk. 18; 11 Mod, 16), have only a particular lien. Bac. Abb. tit. Trover, E. P. 694. (What Lord Ellenborough says [7 E. 229] merely exemplifies this, as the question there discussed was of general lien only).
The finder of lost goods [on land] had no lien at common law, even if he preserved them. [Consent was lacking?] Binsted v. Buck, 2 W. Bl. 1117; Nicholson v. Chapman, 2 H. Bl. 254-1793.
An innkeeper, the common law of England considering it necessary for the public that all who undertake to keep a common inn should bo under obligation to receive every one offering himself as guest (Y. B. 5 ed. 4, fol. 2; 22 Ed, 4, fol. 19; S. P. Keilway, 50 ; 1 Hawk, 220; Dolt, chap. 7, and many other cases) if there be sufficient room for him in the inn (Lane v. Cotton, 1 Ld. Raym. 654; 5 T. R. 275), had a particular lien (1 Bulstr. 207 ; Bac. Abb. title Liens) against both goods and guests. Forteseue de Laud, p. 82; Hawk, P. C. 1, c. 78, § 8 ; c. 80, § 6 ; Oro. Jac. 609 ; York v. Grindstone, 1 Salk, 388, etc. And against his guest’s horse for its feed and stabling. Y. B. 5 ed. 4, fol. 2 ; Yelv. 67.
[For statute giving concurrent remedy toeenforce the lien, see L. 1879, c. 530; same stat. 2 R. S. 8 ed. 1420. Surreptitious removal of baggage without paying, punished by Penal Code, § 882.
Lodging-house keeper, not an innkeeper ; see Cochrane v. Schryver, 12 Duly, 174; Swan v. Smith, 3 N. Y. State Rep. 588.]
Landlords, at common law, had no lien for rent upon a tenant’s goods, but had a right to seize or distrain goods found on the leased premises. The right may be called a lien; but it differs essentially from the landlord’s statutory lien, because there was no fixed lien until the property was levied on.
The livery-stable keeper had no lien. York v. Greenaugh, Ld. Raym. 866 ; Hunter v. Berkeley, 2 Esp. ni. pri. 583.
[For present statute, see L. 1872, c. 498; same stat. 2 R. S. 8th ed. *258 1422, Lessels v. Farnsworth, 3 How. Pr. N. S. 73; Id. 364; s. c., 18 Daly, 478; Armitage v. Mace, 96 N. Y. 538, affi’g. 48 Super. Ct. (J. & S.) 107 ; Eckhard v. Donohue, 9 Daly, 214; Jackson v. Kasseall, 30 Hun, 231.]
Millers had a particular lien and not a general lien. Exp. Ockenden, 1 Atks. 235.
A printer oí engravings and etchings was (inferentially) held not to have a general lien on plates in his hands. Marks v. Lahee, 3 Bing. N. C. 408.
Salvors had a lien—necessarily a particular one only—on the goods saved. Hartfort v. Jones, 1 Ld. Raym. 393. The lien was early recognized by statute. Vide 27 Edw. III, stat. 2, c. 13.
[Stallion's service. For present statute giving lien on mare and foal for compensation for stallion service, see L. 1887, c. 458 ; as am’d. by L. 1888, c. 457.]
Tailors had a particular lien. Y. B. 5 ed. 4, fol. 2; Yelv. 67; Cowper v. Andrews, Hobart, 42, and other cases.
Vendor of goods. The vendor's lien for the price of goods sold is an ancient common law right (differing therein from the doctrine of stoppage in transitu which was first introduced in courts of equity ; the earliest instance being Wiseman v. Vandeputt [1690] 2 Vern. 203). It continues so long as the property remains in possession without payment or tender of the agreed price, despite the fact that the general property vests in the vendee by the sale itself. Y. B. 5 Eb. 4 b. 4, Sp. 22 (E) 4 fol. 49, Cowper v. Andrews, Hob. 41; Mason v. Lickbarrow, 1 H. Bla. 363; 2 Bla. Comm. 448. Such lien is not divested by partial payments (see Hodgson v. Loy, 7 T. R. 440 ; Feice v. Wray, 3 East, 93). Of course a delivery of the goods to the vendee or his agent divests the lien (Godfrey v. Furzo, 3 P. Williams, 185), even if it be symbolical or constructive. Dicta of Lord Kenyon, in Ellis v. Hunt, 3 T. R. 464; Copland v. Stein, 8 T. R. 199 ; or it be the delivery of a part only of goods sold under an entire contract. Slubbey v. Hayward, 2 H. Bla. 504; Hammonds v. Anderson, 1 N. R. 69. If, of course, any condition attached to the symbolical or constructive ' delivery be not performed, however, the vendor’s lien remains. Exp. Gwynne, 12 Vesey, Jr. 379.
The “ partial ownership ” theory to account for the vendor’s lien on goods sold has been advanced or advocated in Bluxome v. Sanders, 4 B. & C. 941, and Audenreid v. Randall, 3 Cliff, 99-106. In the former of these cases, decided in 1825, Dally, J., said: “ The vendor’s right . . is not a mere lien which he will forfeit if he parts with pos-' session, but grows out of his ownership and original dominion.” And in Dodsley v. Varley, 12 Ald. & E. 632-634, 1840, it was said, “ The *259 vendor had not what is commonly called a lien determinable on the loss of possession, but a special interest, sometimes but improperly called a lien, growing out of his original ownership, independent of actual possession, and consistent with the property being in the purchaser. This he retained in respect of the terms agreed on, that the goods should not be removed to their ultimate place of destination before payment, but this lien is consistent with the possession having passed to the buyer so that there may have been a delivery to and actual receipt by him.”
The learned judge writing that opinion seems to have been imbued with the doctrine of the equitable lien of the vendor of land, and sought to assimilate the rules concerning personal property with the rules concerning real estate.
[See Bonnell v. Babcock, 80 N. Y. 244, opinion per Church, J. And see Benjamin on Sales.]
Vendor of land. A grantor’s lien for purchase money of lands is riot a common law lien, but is an equitable lien ; there being no possession after delivery of seizin no common law lien can exist. The “ right to hold” cannot be predicated of that which is out of possession.
III. Lien of the warehouseman and wharfinger.
The alternative form of expression which is used by the text writers, [citations above given] and which has been used in this brief—“ warehouseman and wharfinger ”—has been advisedly employed. “ Trade ” during the time when the common law was framed was principally the trade of London. Water carriage was then as now the cheaper carriage. Then, practically all “ warehouses ”—in contradistinction to the trader’s own warehouse, his premises or a portion thereof—were upon or in connection with wharves. To-day, in London, the warehouse is to a great extent upon, as here in New York it is upon, or adjacent to, the wharf. Does not the expression “ the Atlantic Docks ” bring to one’s mind certain warehouses in Brooklyn ; and when a steamer is referred to as discharging at the docks adjacent to the Wall Street Ferry on the Brooklyn side, does any other expression than “at the Mediterranean Stores” occur to the mind ?
The vast preponderance of trade has always been, at least until the “ railroad era,” now scarcely thirty years old, of goods to and from seaports. Immediate accommodation must be found for the reception of cargoes upon arrival with as little expense for cartage as possible. The grain elevators and warehouses, where goods are collected to be placed on shipboard, are, for the same reason, to-day, upon or adjacent to docks, or, if at an interior point, for the same reason, stand in or *260 adjacent to the freight yard, where the modern “ship of the desert”— the freight car—can be conveniently laden or discharged.
When the carrier brought goods tq the great distributing centre— London—he delivered them at a “ warehouse on a wharf.” When he took goods from the great distributing centre into the interior, he got them out of the “ warehouse on the wharf” at which they had been, landed.
And, therefore, it is that we find in the common law cases such expressions as “ the defendant was a wharfinger on his wharf.”
Mr. Whittaker does not refer to “warehousemen ;” specifically or apart from wharfinger he says, at page 34: “It is, therefore, not questionable that factors, packers, wharfingers, . . . have a general lien.”
In his considering “ under distinct heads, the liens of each particular character,” he gives a chapter to “ wharfingers” alone, and yet the-“warehouse ” was well known to him, for he says in the division of his work allotted to “ stoppage in transitu ” (p. 196): “ Where the goods are sent to a packer for and by order of the vendee, the packer will only be considered as a middle man and the goods in his hands as being still in their transit, provided that in these cases the vendee does not use the wharfinger’s or the packer’s warehouse as his own.”
(In Mills v. Bald, 2 Bos. & Pul. 457, Lord Alvany spoke of “ a delivery to the wharfinger,” in referring to the case of Smith v. Goss, 1 Camp. 282.)
So in Harmon v. Anderson, 2 Camp. 243, it appears that the question was in regard to a “wharfinger in whose warehouse” the goods were lying at the time of the sale.
Now, however, time has reversed the verbal usage and to-day we do not hear of “wharfinger,” but only of “warehouseman.” Just as-formerly they heard of the “ wharfinger and his warehouse.”
Could it be claimed that there are different principles of law which apply to a warehouse situated on a dock and a warehouse situated near a dock ? W ould any one say, that if the wharfinger’s warehouse was situated across the street from his dock, a different rule of law applied to him than the rule which would apply if the street did not intervene ? Or, that the fact of a warehouse situated on a dock being carried on by a different person from the dock owner necessitated an application of a different rule of law in regard to lien from that which would apply if the owner of the dock carried on the warehouse ? It seems unreasonable, and it has been so characterized by court and text writer.
[Blackstone's Gommentaries and Jones on Liens, above cited at length.] A parallel is also found in the converse—their respective responsibilities.
Thus Story, in his work on Bailments, 8th edition (§ 442), classes *261 81 warehousemen and wharfingers” together (in his article on hire of custody) for the purposes of responsibility, and says (§ 452): “ The case of a wharfinger does not, indeed, seem in any respect distinguishable from that of a warehouseman, and it has not, in fact, been distinguished from it in any solemn adjudication. Sidaways v. Todd, 2 Stark. 400; 1 Bell Comm. p. 467, and note 6, 5th ed.”
Mr. Jones, in his work on Liens, varies between the two views, after stating, as above mentioned, that each is a prominent example ■of a general lien, he seems to pin his faith to Steinman v. Wilkins, 7 Watts. & Sar. 466, and to the views pf Chief Justice Gibson therein expressed, and then, again, he unconsciously wanders back to the better view (§ 973) and recognizes the fact that the warehouseman and the “wharfinger” are the same, for when giving the methods by which a warehouseman can waive his lien (§ 397), he cites a case, of which he says: “ By the course of trade, the wharfage due upon goods was not due until Christmas following the importation, whether the goods were removed in the meantime or not” [Crawshay v. Homphray, 4 B. & Ald. 50], whereby the lien was held to be waived.
Again, in section 975, he cites with approval the case of Moet v. Chiclcering, 8 Chan. Div. 372 [reversing same case, 6 Chan. Bin. 770], as sustaining the proposition, that “a warehouseman or wharfinger [sic] does not lose his lien because the goods have a fraudulent trade mark,” and quotes the language of Lord Justice Cotton in delivering the opinion in that case : “ The lien of the wharfinger [Jones cites it as authority in regard to warehouseman] is ” . . . “ against the bottles and wine when the fraudulent corks have been removed, and I cannot see any possible ground when these have been removed for saying that their lien for warehouse expenses loses any priority that it before had, and which was a first charge against these goods.”
Then when our author comes to deal more especially with wharfingers (§ 977), he swings back and blindly follows Chief Justice Gibson, and introduces, in accordance with that gentleman’s views, a new division, distinction or qualification into the law of liens. He says that the warehouseman’s lien is a “ common law lien,” and the wharfinger’s is a “ commercial or customary ” lien.
[This is a most uncertain method of division, and can only be true at some given date at which it can be shown that custom had so firmly established the warehouseman’s lien that it was settled, i. e., common law, while the “wharfinger’s” lien was then so recently established, that it was still spoken of as dependent on usage, i. e., “ customary,” for the common law was as well “ settled general custom ” as “ policy.”]
He explains his meaning by quoting from Chief Justice Gibson : 81 There is a well known distinction between a commercial lien, which *262 is the creature of usage, and a common law lien, which is the creature of policy. The first gives the right to retain for a balance of accounts. The second for services performed in relation to the particular property. Commercial or general liens, which have not been fastened on the law merchant by inveterate usage, are designated by the courts as encroachments on the common law.”
[The lien which was the creature of policy was where the bailee was compellable to receive (ante).]
Our author then, feeling that this distinction is unsatisfactory, as he well may in view of the cases that he is obliged to cite sustaining the wharfinger’s general lien, which were purely cases pending on proof of usage and custom, and were so stated to be in the opinions (given hereafter), states that there is no reasonable foundation for this distinction between the lien of a warehouseman and that of a wharfinger, and then claims that they should both be specific lions. At the end! of the paragraph, however, he points to the very fact which makes the warehouseman’s lien in principle a general lien, as being the reason why the wharfinger’s lien is held a general lien, and which reason can only apply to a wharfinger as a warehouse keeper, to wit: He says, that the wharfinger’s general lien may have arisen from the custom of wharfingers “ in earlier times to make advances upon the goods” [ which must have therefore been warehoused by them], and which it is notorious ware-housemen have always done.
He then cites the case of Naylor v. Mangels, 1 Ep. 109, (1794) saying, “ It appeared that a person having twenty-five hogsheads of sugar stored with a wharfinger, sold the sugar1, but the wharfinger refused to deliver it to the purchaser, claiming to hold it for the balance of account due him from the seller on account of wharfage and advances not relating to this particular sugar.” The opinion in that case is so short that it will here be given in full from the report :
“Lord Kenvon said: Liens were either by common law usage or agreement. Liens by common law were given where a party was obliged by law to receive goods, etc., in which case, as the law imposed the burthen, it also gave him the power of retaining for his indemnity. This was the case of innkeepers who had by law such a lien. That a lien from usage was matter of evidence. The usage in the present case had been proved so often, he said it should he considered as a settled point, that wharfingers had the lien contended.for.”
-Mr. Jones also cites the very well known case of Spears v. Hartly, 3 Esp. 81, tried at nisi prius, 1800, before Lord Eldon, the full report of which is as follows :
“ Spears v. Hartly (February 19). This was an action of trover, for a log of mahogany. The defendant was a wharfinger, and claimed *263 a lien on it, as well for the wharfage as for the balance of a general account; which balance was due in the year 1790, under which lien he justified a right to retain it. Best, Sergeant, for the plaintiff contended, that admitting the defendant might claim a lien for the wharf-age due on a particular article, he was not entitled to such lien for the balance of a general account.
“ Lord Eldon, referring to the case of Naylor v. Mangels, ante, 1 vol. 109, said : “This point has been ruled by Lord KBNyox, that a wharfinger has a lien for the balance of a general account, and considered as a point completely at rest; I shall therefore hold it as the settled law on the subject, that he has such a lien as is claimed in the present case.”
“ Best then contended, that it appeared that the balance which the defendant claimed to be due, and under which he entitled himself to a lien, had accrued in the year 1790, and so was barred by the statute of limitations ; the-debt being therefore discharged by operation of law, the defendant could not be entitled to any lien by virtue of it.”
“ Lobd Eldon.—If what has been stated by the defendant’s counsel be law, that the debt is discharged by the operation of the statute of limitations, no lien could be obtained by reason of it; but the debt was not discharged, it was the remedy only. I am of opinion that though the statute of limitations has run against a demand, if the creditor obtains possession of goods on which he has a lien for a general balance, he may hold them for that demand by virtue of the lien. In this case the defendant had a subsisting demand- when the goods came in his possession ; and I am of opinion he may enforce it by the lien which the law may give him for his general balance.
“ Verdict for the defendant.”
So in our State statutes all the provisions in regard to fraudulent receipts representing goods are made to apply, in the same breath, to “warehousemen and wharfinger.” Laws of 1858, chap. 326, §§ 1, 2, 3, 4, 5, 6, and 7. And section 6 speaks of “ warehouse receipts given for any goods, wares, etc., stored or deposited with any warehouseman, wharfinger or other person.”
Also in Robinson v. Springfield Iron Co., 39 Hun, 634-638, the only authority cited by Judge Daniels to sustain a lien for the wharfage of the whole upon a remainder, is a “ warehouseman’s” case, Schmidt v. Blood (given below).
Also it is to be noted that in Crawshay v. Homphray, supra (1820), the headnote and the statement of the case say that the lien was claimed for “wharfage, etc.” The goods were landed October 14th, and remained until at least March following. Therefore, part of the *264 “ etc.” was storage, and no distinction was made or point was raised as to this.
Our author [Jones] then cites Rex v. Humphrey, 1 MeClel. & Y. 173, and with an inclination to return to th^Mnltiew, says, in a note to the section that it indicates (23 [Vol. 14 N pQ3t Law. Reg. 465-469), why it was that the supposed (sic) differencerojkeen the lien of a warehouseman and that of a wharfinger arose. ItWhpears that a distinction was in that case, for the first time, suggesteün>etween that portion of the claim which was for storage and the remainder. That Baron Graham said that he had always considered the case of a wharfinger and of a warehouseman as standing on the same ground ; one of the other two judges intimated a doubt on the point, and the third said he had not considered it, so the point stood over, but it was not argued or passed on for the reason that the point was found to he immaterial to the case.
The Pennsylvania case, which has been referred to once or twice heretofore (Steinman v. Wilkins, 1 Watts & Bar. 466), and on which Mr. Jones relies, does not undertake to decide, that a warehouseman has not a general lien except as obiter. It takes up the subject of a warehouseman’s lien as a new question, stating that no text writer has treated of warehouse room as a subject of lien in any shape. It then proceeds to dispose of it as a practically new question, saying: “But there is doubtless a specific lien provided for it by the justice of the common law,” and it is to be noted that the court stretched this specific lien, which it allowed, as far as a specific lien can be stretched, by allowing the warehouseman (who prevailed in the case) to retain what things were left in his hands against all his charges on all the goods. The court does, however, say : “It would be impossible to maintain the position of Baron Graham, for there is no evidence of usage and afoundation for it,” but the court wholly overlooks the lack of distinction between the wharfinger’s lien for storage and the warehouseman’s lien for storage.
It is fair to say that upon affirmative proof that in the city of Hull, it was a disputed point whether a wharfinger’s general lien included both labor and warehouse rent, it was held in Holderness v. Collinson, 7 Barn. & C. 212, that it could not be insisted upon as to the latter item.” But “ warehouse rent,” i. e., the rental of a warehouse situated upon a wharf and let as an entirety to a merchant [a frequent practice apparently; see Rex v. Humphrey, supra,] would seem a different question.
The case of Leuckhart v. Cooper, 3 Bing. N. C. 99 (6 Will. IV.) indicates that the warehouseman was considered to have the usual, but not an unusual and extraordinary general lien. It was an attempt on *265 the part of warehouse keepers (Cooper & Co.) to retain the wool of “ a foreign merchant (Leuckhart) for a general lien which they had against one Heilbron, who v^asjfhe plaintiff's factor.” The wool had been consigned from abpbffr|5*eilbron was in no sense the owner. The attempt was to hwdbig^Inst the owner the last eleven bales for a large balance of stwhgeViiarges, freight and duty, paid on account of Heilbron and &t(tf§i request on the whole; the case decides that credit had been given t^Heilbron personally, and that he was admittedly not the owner of the goods. It is to be noted that even under the particular lien the defendants could have admittedly held these eleven bales for the whole, had Heilbron been the owner. The court (Tindal, Oh. J.), emphasizes the fact that the custom there attempted to be set up was that of a general lien upon all goods from time to time housed or remaining in their warehouses for and in the name of the merchants or other persons by whom such public warehouse keepers are retained and employed, for all moneys or any balance thereof due from such merchants or other persons to such public warehouse keepers for or on account of advances or expenses which such public warehouse keepers should have made or been put to in and about the paying of duties or of custom on goods consigned to them from abroad. . . So that the general lien claimed is not confined to goods the property of the person who employed or retained the warehouse keeper, but extends to all goods which are put by him into the hands of the warehouse keeper, whether his property or not. The custom set up in the plea, if supportable, would make the goods of a foreign merchant . . . liable to a private debt of the factor, for expenses incurred in respect of other goods of third persons, which had been in his, the warehouseman’s, hands, at former times, for charges contracted upon such goods during any antecedent period of time, and that to an unlimited extent. It appears to us that such a custom is at once unreasonable and unjust, and therefore bad in law. It is a custom which is obviously prejudicial, in a direct manner and in a very high degree, to foreign trade.”
The court also said (p. 108): “ The proposition contended for is that the goods became, by the operation of the custom, pledged for the factor’s debt, though the factor was unauthorized by law to pledge them directly.”
And, concluding, says, the custom was pleaded so largely as to cover even the case of the warehouseman having knowledge that they are not the property of the factor, as a further objection against sustaining it. But neither court nor the plaintiff’s counsel himself, even suggested that, as regards a general balance due- from the owner of the goods, the warehouseman was not recognized as having, by the common law—arising from custom-—a general lien. The plaintiff’s *266 argument was (p. 103): “ The lien can be asserted only against the ' bailor himself, and every attempt to extend liens beyond the interest | of the bailor has failed. And the court, citing Oppenheim v. Russell, 3 Bos. & Pul. 42, says, “ This right of general lien shall not operate upon or against the rights of third persons.”
Dresser v. Bosanquay, L. J. 32 N. S. 57 (1862) was decided under certain special statutes. It was there held that a dock company which had dealt under the special act of Parliament incorporating the company, and the recent general acts of Parliament, which gave them certain special rights of lien, had not the general lien which belonged to them as wharfingers at common law for warehouse room. ■ Also that neither the special nor general act entitled them to detain goods for charges due on other goods belonging to different owners, though all entered in the name of the same person. It was a case stated, and it exactly sustains Leuckhart v. Cooper. It is interesting because Cockburn, O. J., speaking of Leuckhart v. Cooper, says that in that case “ The custom claimed was held unreasonable, as it clearly was as claiming a general lien not merely as against the real owner of different goods, but as against all goods deposited by the same person, whether a factor or not.”
ÍAnd Wightman, J., says on the same point, “In the present case, the same objection is taken by the plaintiff, that it is unreasonable to detain one man’s goods for the charges due from another.”
This (Dresser v. Bosanquay) is also reported in 4 Best <& Smith, Q. B. 460, and in the report there of the opinion rendered by Cockburn, Ch. J., he clearly puts the decision on the special acts, and holds that to construe the special act so as to allow the warehouseman to keep goods belonging to a third party against the general debt of the brokers, would he inconsistent with justice, and on page 481, during the argument, he construes the act incidentally by saying that the statute gave the company not a cumulative, but a different, remedy.
It is submitted that, at common law, the case of the warehouseman and of the wharfinger is indistinguishable.
There appears to be but one case in this State where the question of lien for storage at common law has been passed upon. It is the case of Schmidt v. Blood, 9 Wend. 268. The only question presented was whether the warehouseman had a lien on the balance for the whole. It was held by the court (Sutherland, J.) that he had. The language of the court, it is fair to admit, looks against the general lien in its full extent, but the question did not then stand for decision.
I The expression used by the court is (p. 271) “Restricting the lien to services rendered in relation to the whole quantity deposited at the same time, it becomes a just and reasonable rule, giving effect *267 undoubtedly to the actual intentions and understanding of the parties and promoting the convenience of trade and business.” It may be fairly said, therefore, that this is not an authority against the positions herein contended for, and that the decision in this regard is within the principle of obiter dicta."
[Statute as to warehouseman’s notice of sale, etc. L. 1879, c. 836; am’d by L. 1883, c. 421; same stat. 4 R. S. 8 ed. 2520, 2521.]
[ Wharfage. For the present statute, see L. 1865, c. 569; same stat 3 R. S. 8 ed. 2253; and see case on wharfage in 39 Fed. Rep.]

 See table on next page.

 But where such liens have been frequently proved to exist, it seems that the courts will consider their existence as settled law, and will not allow it to be afterwards disputed.